---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

MOJAVE DESERT AIR QUALITY
MANAGEMENT DISTRICT

    *Petitioner*

v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN,
Administrator of the United States
Environmental Protection Agency

    *Respondents*.

No. 25-_____

---

## PETITION FOR REVIEW

---

R Raymond Rothman
Joseph Bias
MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071
Telephone:  213.612.2500
Facsimile:  213.612.2501

*Attorneys for Petitioner*
*Mojave Desert Air Quality Management*
*District*

Pursuant to Rule 15 of the Federal Rules of Appellate Procedure and section 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b), the Mojave Desert Air Quality Management District (the "District") hereby petitions this Court for review of final actions of Respondents, the U.S. Environmental Protection Agency ("EPA") and Lee Zeldin, Administrator, U.S. Environmental Protection Agency, that are memorialized in a Final Rule entitled "Federal Implementation Plan for Nonattainment New Source Review Program; Mojave Desert Air Quality Management District, California," which was published in the Federal Register on December 30, 2024 at 89 Fed. Reg. 106332-01 and placed in two EPA dockets: EPA-R09-OAR-2024-0228 and EPA-R09-OAR-2022-0338 (the "2024 Final Rule").[1]  In this 2024 Final Rule, EPA took "new agency action" in response to a remand from this Court to disapprove of District Rule 1304(C)(2)(d) and to promulgate a federal implementation plan that will usurp the District's sovereign authority to regulate air quality on behalf of the State of California within its designated region.  A copy of the 2024 Final Rule is attached hereto as Exhibit 1.  This Court has jurisdiction and is a proper venue for this action pursuant to 42 U.S.C. § 7607(b).  The District asks the Court to vacate the 2024 Final Rule because it is not in accordance with that law and is arbitrary and capricious.

---

[1] Michael S. Regan was the Administrator of EPA when the 2024 Final Rule was published in the Federal Register.  Mr. Regan resigned his position as the Administrator of the EPA effective December 31, 2024.

Dated:  January 31, 2025   Respectfully submitted,

          *s/ R Raymond Rothman*
          R Raymond Rothman
          Joseph Bias
          MORGAN, LEWIS & BOCKIUS LLP
          300 South Grand Ave., 22nd Floor
          Los Angeles, CA 90071
          (213) 612-2500

          *Counsel for Petitioner*
          *Mojave Desert Air Quality Management*
          *District*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, Petitioner

Mojave Desert Air Quality Management District (the "District") certifies the

following: the District is a governmental entity that is not subject to Rule 26.1.


Dated: January 31, 2025                  _s/ R Raymond Rothman_____
                                         R Raymond Rothman
                                         *Counsel for Petitioner*
                                         *Mojave Desert Air Quality Management*
                                         *District*

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system, and that on the same day, a true and correct copy of the foregoing Petition for Review, with attachment, was served by FedEx priority overnight delivery on the parties below.

Petitioner will ensure that the parties below will receive a court-stamped copy of the Petition for Review with the date of filing. In accordance with Rule 25(d) of the Federal Rules of Appellate Procedure, I hereby certify that pursuant to 40 CFR § 23.12, a copy of the Petition for Review, with attachment, time-stamped by the Clerk of the Court, will be served by United States certified mail, return receipt requested, upon each of the following:

Lee Zeldin
Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Ave., NW
Mail Code: 1101A
Washington, DC 20460

The Honorable James R. McHenry III
Acting Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Correspondence Control Unit
Office of General Counsel (2311)
U.S. Environmental Protection
Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Dated: January 31, 2025          *s/ R Raymond Rothman*
                                   R Raymond Rothman
                                   *Counsel for Petitioner*
                                   *Mojave Desert Air Quality Management District*

**EXHIBIT 1**

the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by February 28, 2025. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. Parties with objections to this direct final rule are encouraged to file a comment in response to the parallel notice of proposed rulemaking for this action published in the proposed rules section

of this **Federal Register**, rather than file an immediate petition for judicial review of this direct final rule, so that EPA can withdraw this direct final rule and address the comment in the proposed rulemaking. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Reporting and recordkeeping requirements.

Dated: December 19, 2024.

**Debra Shore,**

*Regional Administrator, Region 5.*

For the reasons stated in the preamble, title 40 CFR part 52 is amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. In § 52.1870, the table in paragraph (c) is amended by revising entries ''3745–23–01'' and ''3745–23–02'' under ''Chapter 3745–23 Nitrogen Oxide Standards'' to read as follows:

### § 52.1870  Identification of plan.

\* \* \* \* \*

(c) \* \* \*

### EPA-APPROVED OHIO REGULATIONS

| Ohio citation | Title/subject | Ohio effective date | EPA Approval date | Notes |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |
| **Chapter 3745–23   Nitrogen Oxide Standards** | | | | |
| 3745–23–01 | Definitions ...................................... | 8/15/2024 | 12/30/2024, [INSERT FIRST PAGE OF **Federal Register** CITATION]. | |
| 3745–23–02 | Methods of Measurement ............... | 8/15/2024 | 12/30/2024, [INSERT FIRST PAGE OF **Federal Register** CITATION]. | |
| \* | \* | \* | \* | \* |

\* \* \* \* \*

[FR Doc. 2024–30734 Filed 12–27–24; 8:45 am]

**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R09–OAR–2024–0228; EPA–R09–OAR–2022–0338; FRL–11830–02–R9]**

### Federal Implementation Plan for Nonattainment New Source Review Program; Mojave Desert Air Quality Management District, California

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is finalizing a Federal Implementation Plan (FIP) under the Clean Air Act (CAA) that consists of Nonattainment New Source Review (NNSR) rules for areas within the jurisdiction of the Mojave Desert Air Quality Management District

(MDAQMD or ''District'') in which air pollutant concentrations are above specific National Ambient Air Quality Standards (NAAQS). The NNSR rules will apply to construction of new major stationary sources and major modifications at existing major stationary sources of air pollution. The FIP will be implemented by the EPA, unless and until it is replaced by an EPA-approved state implementation plan (SIP). In this action, the EPA is also responding to a September 5, 2024 decision of the United States Ninth Circuit Court of Appeals for the Ninth Circuit, which remanded the EPA's disapproval of a MDAQMD rule provision related to the calculation and generation of emissions offsets. This response again disapproves MDAQMD Rule 1304(C)(2)(d) and provides additional information to support that decision.

**DATES:** This final rule is effective on February 28, 2025.

**ADDRESSES:** The EPA has established a docket for the FIP rulemaking under Docket ID No. EPA–R09–OAR–2024–

0228. The EPA established a different docket (EPA–R09–OAR–2022–0338), for its 2023 limited approval/limited disapproval of a MDAQMD state implementation plan submission, which contained provisions addressing the calculation and generation of emissions offsets for the nonattainment area permitting program. This notification will be placed in both dockets, which are each accessible via the Federal eRulemaking Portal at *https://www.regulations.gov/*. Although listed in the indices for these rules, some information is not publicly available, *e.g.*, Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically at *https://www.regulations.gov* or in hard copy at the U.S. Environmental Protection Agency, EPA Docket Center, William Jefferson Clinton West Building, Room 3334, 1301 Constitution Ave. NW,

Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the Office of Air and Radiation Docket is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:**
Tanya Abrahamian, Air and Radiation Division, Rules Office (AIR–3–2), Environmental Protection Agency, Region IX, telephone number: (213) 244–1849; email address: *Abrahamian.Tanya@epa.gov.*

**SUPPLEMENTARY INFORMATION:**
Throughout this document, ''we,'' ''us,'' and ''our'' refer to the EPA.

*The information presented in this preamble is organized as follows:*

**Table of Contents**

I. Summary of the Proposed Action
II. EPA Response to the Ninth Circuit's Remand
III. Public Comments on FIP and EPA Responses to Comments and Court Remand
IV. Final Action
V. Supporting Information
VI. Statutory and Executive Order Reviews

**Preamble Glossary of Terms and Abbreviations**

The following are abbreviations of terms used in the preamble.

APA   Administrative Procedure Act
Appendix S   40 CFR part 51, appendix S
BACT   Best Available Control Technology
CAA   or Act Clean Air Act
CARB   California Air Resources Board
CFR   Code of Federal Regulations
EPA, we, us, or our   The United States Environmental Protection Agency
ERC   Emission Reduction Credit
FIP   Federal Implementation Plan
FR   Federal Register
LAER   Lowest Achievable Emission Rate
LA/LD   Limited Approval-Limited Disapproval
MDAQMD   The Mojave Desert Air Quality Management District
NAAQS   National Ambient Air Quality Standards
$NO_X$   Nitrogen Oxides
NSR   New Source Review
NNSR   Nonattainment New Source Review
PSD   Prevention of Significant Deterioration
PAL   Plantwide Applicability Limit
$PM_{10}$   Particulate Matter with a diameter of 10 micrometers or less
PTE   Potential To Emit
RACT   Reasonably Available Control Technology
RFP   Reasonable Further Progress
SER   Simultaneous Emission Reduction
SIP   State Implementation Plan
TSD   Technical Support Document
VOC   Volatile Organic Compound
2023 LA/LD   The EPA's rulemaking action at 88 FR 42258, which was published on June 30, 2023, in the **Federal Register**.

**I. Final Action To Establish Federal Implementation Plan**

On July 9, 2024 (89 FR 56237), the EPA proposed to establish a Federal Implementation Plan (FIP), pursuant to (Clean Air Act) section 110(c), for a nonattainment New Source Review (NNSR) program within the Mojave Desert Air Quality Management District (MDAQMD).[1] This FIP relates to a finding of failure to submit issued by the EPA on February 3, 2017, and EPA's action to disapprove a part of the MDAQMD's Nonattainment New Source Review (NNSR) permitting program regulations on June 30, 2023 (88 FR 42258) (''2023 LA/LD''). The latter action was a limited approval/limited disapproval action in which EPA disapproved MDAQMD's Rule 1304(C)(2)(d) because this rule failed to meet requirements for determining the quantity of offsets needed to issue a permit for a major modification.

This FIP implements NNSR program requirements and will apply to the construction of new major sources and major modifications at existing major sources that are located within areas that are designated as nonattainment with specific National Ambient Air Quality Standards (NAAQS). This FIP will apply to pollutants for which the area is designated nonattainment. Therefore, this action applies only in the areas within the MDAQMD's jurisdiction that are designated nonattainment, specifically, the San Bernardino County portion of the West Mojave Desert ozone nonattainment area and the San Bernardino County and Trona Planning Area Particulate Matter with a diameter of 10 micrometers or less ($PM_{10}$) nonattainment areas.[2] The EPA will implement the FIP in these areas until such time as the EPA approves a SIP submission from the MDAQMD that fully resolves the deficiencies identified in the EPA's June 30, 2023 limited approval/limited disapproval (''2023 LA/LD'') action on the MDAQMD's NNSR program and identifies no new deficiencies.[3] This FIP satisfies the statutory requirements for SIPs and NNSR programs in CAA

sections 110(c)(1), 172(c)(5), 173, 182(c) and (d), 189(a)(1)(A) and (e), 301(a), and 302. The provisions of the FIP are also designed to meet the requirements for state plans in the EPA regulations at 40 CFR 51.165, 40 CFR 51.1114, and 40 CFR 51.1314.

The FIP that is finalized in this action addresses the deficiencies the EPA identified in the MDAQMD's NNSR program by incorporating requirements from 40 CFR part 51, appendix S (''Appendix S''), as well as additional requirements to make the program administrable. Upon the effective date of this action, permit applicants will need to obtain two permits—one permit from the EPA under this FIP and one permit from the MDAQMD under the rules in the SIP. Where permit approval criteria between the MDAQMD's SIP and this FIP conflict—for example, the procedures to determine the quantity of offsets at a major modification, a deficiency in the MDAQMD's NNSR program—permit applicants need to demonstrate compliance with the requirements of this FIP, since this FIP fills the gaps in the MDAQMD's NNSR program. To the extent that there are any differences in the required permit application materials under the FIP versus the SIP, the applicant will need to comply with both requirements when submitting its permit application. The EPA will enforce the FIP as provided under CAA section 113(a). Our notification proposing this action includes further information on the implementation, purpose, components, and severability of this FIP.[4]

**II. EPA Response to the Ninth Circuit's Remand**

In this rulemaking, the EPA is also taking final action in response to a remand to the Agency by the U.S. Court of Appeals for the Ninth Circuit in *Mojave Desert Air Quality Management District* v. *U.S. Environmental Protection Agency* (''*MDAQMD* v. *EPA*'').[5] As background, on July 10, 2023, the MDAQMD filed a petition for review in the Ninth Circuit Court of Appeals of the EPA's 2023 LA/LD of the MDAQMD's NNSR program. The focus of the litigation was the EPA's disapproval of the MDAQMD's Rule 1304(C)(2)(d). The MDAQMD argued that the EPA had failed to adequately explain the disapproval in light of the Agency's 1996 approval of a

---

[1] The EPA's finding of failure to submit triggered an obligation under CAA section 110(c) for the EPA to promulgate a FIP within two years (*i.e.*, by March 6, 2019). 82 FR 9158, 9161 (February 3, 2017).

[2] See 40 CFR 81.305. The ozone nonattainment area is located within San Bernardino County. The $PM_{10}$ nonattainment areas consist of all of the MDAQMD portion of San Bernardino County: the Trona Planning Area and the portion of San Bernardino County that excludes both the Trona Planning Area and the portion of San Bernardino County that is located in the South Coast Air Basin. A map of this area is available in the docket for this action.

[3] 89 FR 56237, 56241.

[4] 89 FR 56237.

[5] *Mojave Desert Air Quality Mgmt. Dist.* v. *U.S. Env't. Prot. Agency,* No. 23–1411 (9th Cir. September 5, 2024), Docket No. EPA–R09–OAR–2022–0338, available in the docket for this action and at *https://cdn.ca9.uscourts.gov/datastore/memoranda/2024/09/05/23-1411.pdf.*

substantially similar, earlier version of the rule. On September 5, 2024, the Ninth Circuit found that the EPA's disapproval of Rule 1304(C)(2)(d) was arbitrary and capricious because the Agency had failed to adequately explain "the reversal of its prior approval of a similar Mojave rule."[6] The court granted the District's petition and remanded the matter "for further proceedings before the agency on an open record consistent with this decision."[7]

In response to a remand from a court and agency can choose one of two paths. The agency may offer a fuller explanation of its reasoning at the time of the remanded agency action, or EPA may take a new agency action that need not be limited to its prior reasons but must comply with the procedural requirements for a new agency action.[8] The EPA is choosing to follow the second of these paths to respond to the Ninth Circuit's remand, reexamining the remanded action and providing a fresh justification for the disapproval of Rule 1304(C)(2)(d), including an explanation for the reversal of EPA's 1996 approval.

The EPA also received comments referencing our 1996 rulemaking action on the proposal for the FIP. In light of the overlapping subject matter, we have elected to include the following two final actions in one rulemaking: (1) a new EPA final action to disapprove Rule 1304(C)(2)(d), as authorized under CAA sections 110(k)(3) and 301(a), that responds to the Ninth Circuit's remand of a portion of our 2023 LA/LD; and (2) EPA's final action on the FIP, as authorized under CAA section 110(c), described above. Our responses to comments in Section III of this action both respond to the comments received on the proposed FIP and provide additional explanation that supports EPA new final action to disapprove Rule 1304(C)(2)(d), consistent with the 2023 LA/LD rule.

For the former action, the EPA must comply with the procedural requirement for a new agency action. Considering the grounds for the court's remand, there is no need for the EPA to provide an additional opportunity for public comment before taking final action to disapprove Rule 1304(C)(2)(d). The EPA provided notice and opportunity to comment on the disapproval of Rule 1304(C)(2)(d) in the 2023 LA/LD action. In reviewing that action, the Ninth Circuit held that EPA's response to one of the public comments on that action was not adequate. The court found that the MDAQMD had sufficiently raised in its comment the contention that EPA's 2023 action was inconsistent with the Agency's prior approval of comparable rule in 1996. Then, the court held that the EPA did not sufficiently articulate a basis for our change of position to support the 1993 disapproval of MDAQMD Rule 1304(C)(2)(d). In this action, the EPA is responding to the MDAQMD's comment in the manner that the Ninth Circuit directed. We have opened the record to the 2023 LA/LD action and provided additional information to support a new disapproval of Rule 1304(C)(2)(d). Considering that the court remanded for the EPA to provide a response to a comment, there is no need to provide an opportunity to submit comments.[9]

## III. Public Comments on FIP and EPA Responses to Comments and Court Remand

The public comment period on the proposed FIP rule opened on July 9, 2024, the date of the proposal's publication in the **Federal Register**, and closed on August 23, 2024. The EPA held a virtual public hearing on July 24, 2024, for members of the public to provide oral comments. This section summarizes the written and oral public comments the EPA received on the proposed FIP rule and provides responses to those comments. The written comments as well as a transcript of the public hearing are available in the docket for this action. The responses below also provide additional analysis and explanation that supports the EPA's disapproval of Rule 1304(C)(2)(d) in the 2003 LA/LD rule.

Twelve written comments were submitted to *https://regulations.gov.* The commenters are listed in Table 1.

TABLE 1—LIST OF COMMENTERS PROVIDING WRITTEN COMMENTS

| Commenter ID | Commenter name | Commenter organization | Type of commenter | Notes |
|---|---|---|---|---|
| 01 ................ | Brad Poiriez, Executive Director ..... | MDAQMD ............................. | State or Local Government Representative/Agency. | This is the first comment letter submitted by the MDAQMD. |
| 02 ................ | Brad Poiriez, Executive Director ..... | MDAQMD ............................. | State or Local Government Representative/Agency. | This is the second comment letter submitted by the MDAQMD regarding the MDAQMD's August 7, 2024 SIP submittal. |
| 03 ................ | Garden Hills Org. & Co. Ltd ........... | ............................. | | This comment is not relevant to the proposed action and the EPA will therefore not be providing a response to this comment. |
| 04 ................ | Clean Future ............................. | ............................. | | This commenter submitted four separate comments, two that supported the proposed FIP as drafted and two that made additional recommendations. |
| 05 ................ | Karnig Ohannessian, Deputy Assistant Secretary of the Navy (Environment and Mission Readiness). | U.S. Department of Defense .......... | Government Representative/Agency. | |
| 06 ................ | L. Dugan ............................. | Marine Air Ground Task Force Training Command, Marine Corps Air Ground Combat Center (MAGTFTC–MCAGCC). | Government Representative/Agency. | |
| 07 ................ | Nicole Valentine ............................. | Pacific Gas and Electric Company | Industry. | |
| 08 ................ | Catalina Elias, Environmental Manager. | CalPortland Company ............... | Industry. | |

---

[6] Id. at 2. The court wrote that its disposition of the case "is not appropriate for publication and is not precedent. . . ." Id. at 1.

[7] Id. at 5.

[8] See, *Biden* v. *Texas,* 597 U.S. 785, 807–809 (2022); *Fischer* v. *Pension Benefit Guarantee Corporation,* 994 F.3d 664, 669–70 (D.C. Cir. 2021).

[9] See, *Fischer,* 994 F.3d. at 670 (additional administrative appeal not needed on remand where the factual record was fully developed).

**Federal Register** / Vol. 89, No. 249 / Monday, December 30, 2024 / Rules and Regulations **106335**

TABLE 1—LIST OF COMMENTERS PROVIDING WRITTEN COMMENTS—Continued

| Commenter ID | Commenter name | Commenter organization | Type of commenter | Notes |
|---|---|---|---|---|
| 09 ............... | Michael Meinen, V.P. Environ-ment and Decarbonization Efforts. | Mitsubishi Cement Corporation ...... | Industry. | |

The EPA also received a total of three comments on the proposed rule during the public hearing. The commenters are listed in Table 2.

TABLE 2—LIST OF COMMENTERS IN JULY 24, 2024 PUBLIC HEARING

| Commenter ID | Commenter name | Commenter organization | Type of commenter |
|---|---|---|---|
| AA ................ | Brad Poiriez, Executive Director .......................... | Mojave Desert Valley Air Quality Management District (MDAQMD). | State or Local Government Representative/Agency. |
| BB ................ | Pedro Dumaua ................................................... | Ducommun, Inc ................................................... | Industry. |
| CC ................ | Daniel McGivney ................................................ | Southern California Gas Company (SoCalGas) | Industry. |

As we stated in the July 24, 2024 public hearing, the EPA considers written comments and oral comments equally in reaching its final decision on the proposed FIP. For clarity, we have divided our responses to the comments we received into two sections: the written comments we received during the public comment period and the oral comments we received during the public hearing.

*A. Summaries of Written Comments and the EPA's Responses*

1. Basis and Timing for the FIP

*Comment A.1.1:* Commenter 01 asserts that the EPA proposed the FIP in "haste," that the proposed FIP relates to a single issue, and that it is unnecessary because it rests on an erroneous assumption.

*Response to Comment A.1.1:* The EPA disagrees with the characterization that the EPA proposed the FIP in haste. As explained in our proposed rulemaking,[10] the EPA's FIP authority and obligation arises from our February 3, 2017 finding of failure to submit, in which we found that the State of California had failed to submit a SIP revision for NNSR rules that apply to a "Severe" classification for the 2008 ozone NAAQS, as required under subpart 2 of part D of title 1 of the CAA and the 2008 Ozone SIP Requirements Rule.[11] The EPA's finding of failure to submit triggered an obligation under CAA section 110(c) for the EPA to promulgate a FIP no later than two years from the finding of failure to submit a complete SIP (*i.e.,* by March 6, 2019).[12] Specifically, the finding stated that if the State did not make the required SIP

submission and the EPA did not take final action to approve the submission within two years of the effective date of the finding, the EPA would be required to promulgate a FIP for the affected nonattainment area.[13] On June 7, 2022, the Center for Biological Diversity (CBD) filed a lawsuit against the EPA alleging that the EPA had failed to promulgate a FIP or approve a SIP by the statutory deadline of March 6, 2019 ("2023 CBD Consent Decree").[14] On June 15, 2023, the U.S. District Court of the Northern District of California entered a consent decree resolving this claim and requiring the EPA to sign a final rulemaking action to either promulgate a FIP or approve a SIP no later than November 29, 2024, although on November 8, 2024, the EPA and CBD agreed to extend the deadline to January 10, 2025.[15] The EPA proposed and is finalizing this FIP for the NNSR program in the MDAQMD to fulfill the EPA's statutory duty by the deadline established under the consent decree.[16]

Relatedly, the 2015 Ozone NAAQS Implementation Rule required the MDAQMD to submit an updated NNSR rule to the EPA by August 1, 2021, no later than three years from the effective date of its nonattainment designation.[17]

On July 23, 2021, CARB submitted to the EPA the MDAQMD's revised NNSR rules for the 2015 ozone NAAQS, which the MDAQMD adopted in March 2021.[18] On June 30, 2023, the EPA finalized an LA/LD of the District's NNSR rules.[19] In this rulemaking, the EPA evaluated the SIP submission to determine its compliance with NNSR requirements for the 2008 and 2015 ozone NAAQS and for the 1987 PM$_{10}$ NAAQS. The EPA's rulemaking for the submitted rules explained that the EPA had identified six deficiencies in the submitted rules that did not fully satisfy the relevant requirements for preconstruction review and permitting in nonattainment areas under section 110 and part D of title I of the Act. These deficiencies prevented full approval.[20] As noted in that final action, this disapproval imposed an obligation on the EPA to promulgate a FIP pursuant to CAA section 110(c) within 24 months of the effective date of the action (*i.e.,* July 31, 2023, setting a deadline of July 31, 2025, for the EPA to promulgate a FIP), unless the EPA approved a SIP revision correcting the deficiencies. The June 2023 final action also noted the EPA's existing obligation under the 2023 CBD Consent Decree to promulgate a FIP for new source review (NSR) SIP elements that the Agency had not approved.[21] The EPA is therefore finalizing this FIP for the NNSR program in the MDAQMD to fulfill the EPA's statutory duty by the deadline

---

[10] 89 FR 52637, 52639.
[11] 82 FR 9158 (February 3, 2017).
[12] Id. at 9161.

[13] Id. at 9158.
[14] *Center for Biological Diversity et al.,* v. *Regan,* No. 3:22–cv–03309–RS (N.D. Cal.) ("2023 CBD Consent Decree"). The consent decree, as entered by the court on June 15, 2023, is available in the docket for this action.
[15] Id. Prior to court's entry of the 2023 CBD Consent Decree, the EPA published a notice in the **Federal Register** announcing the proposed settlement and providing an opportunity for interested persons to submit comments. 88 FR 20166 (April 5, 2023). The EPA received no comments on the proposed settlement. The parties' joint stipulation to extend the consent decree deadline is available in the docket for this action.
[16] 2023 CBD Consent Decree, *supra* n. 13.
[17] 83 FR 62998 (December 6, 2018).

[18] 88 FR 42258 (June 30, 2023). CARB's submittal stopped the sanctions clocks that started as a result of the 2017 Finding of Failure to Submit, but not the FIP clock, since the latter requires approval of the SIP submission.
[19] Id.
[20] Id.
[21] Id. at 42268.

**106336** **Federal Register** / Vol. 89, No. 249 / Monday, December 30, 2024 / Rules and Regulations

established under the 2023 CBD Consent Decree.

*Comment A.1.2:* Commenter 08 states that it understands that the EPA is proposing the FIP under both a statutory deadline established by a consent decree resulting from its failure to act in a timely manner on various SIP submissions and under a regulatory deadline required by CAA section 110(c). Commenter 08 states that the EPA acted to propose the FIP nearly five months sooner than required by the consent decree. Commenter 08 believes that the proposed FIP presumes the outcome of the ongoing litigation, and the hasty action on the EPA's part does not demonstrate a good faith effort to allow the MDAQMD to continue to implement its own NNSR program.

*Response to Comment A.1.2:* The EPA proposed this FIP for the MDAQMD NNSR program to fulfill the EPA's statutory duty by the deadline established under the 2023 CBD Consent Decree.[22] The terms of the consent decree require the EPA to sign a notice of final rulemaking to approve a revised SIP submission, to promulgate a FIP, or to approve in part a revised SIP submission and promulgate a partial FIP for the Severe NNSR SIP element in the MDAQMD no later than January 10, 2025.[23] Because the FIP can only be promulgated through a notice and comment rulemaking, it was necessary for the EPA to propose the FIP several months before the final signature deadline to give time for the public to review the draft rulemaking, provide comments, and allow for the EPA to consider and respond to those comments in a final agency action.

Commenter 08's assessment of the basis for the EPA's promulgation of the FIP and the timing of the FIP is not correct. The EPA's obligation to promulgate a FIP stems from our 2017 Finding of Failure to Submit the NNSR SIP element for a Severe-15 ozone nonattainment area.[24] Our 2017 action started the clock for when the EPA would need to promulgate a FIP, consistent with CAA section 110(c). Thus, since March 6, 2019 (two years after the effective date of the action, under CAA section 110(c)), the EPA has had an obligation to promulgate a FIP unless it approved the MDAQMD's

NNSR program. Because the EPA has not fully approved the MDAQMD's NNSR program, the EPA remains obligated to promulgate a FIP unless the MDAQMD addresses the deficiencies identified in the 2023 LA/LD.

After extensive coordination between the EPA and MDAQMD, the MDAQMD adopted revised NSR rules on March 22, 2021, which CARB, as the governor's designee, submitted to the EPA on July 23, 2021, for approval into the SIP. In the transmittal letter from the MDAQMD to CARB accompanying the amended NNSR rules, the MDAQMD wrote that the issue regarding MDAQMD Rule 1304(C)(2)(d) may need to be resolved in court.[25] The EPA's 2023 LA/LD was the final action on the 2021 submittal. The FIP clock that commenced with the 2023 LA/LD is separate from the FIP clock that began with the 2017 finding of failure to submit, in contrast to the statements Commenter 08 made in its comment number 1 on the proposed FIP; again, that deadline passed in 2019.

Following the EPA's finalization of the 2023 LA/LD on June 30, 2023, the MDAQMD filed a petition for review of that action in the U.S. Court of Appeals for the Ninth Circuit Court on July 10, 2023. On September 5, 2024, the Ninth Circuit Court of Appeals in the case *Mojave Desert Air Quality Management District* v. *EPA* remanded to the EPA the Agency's determination that the MDAQMD Rule 1304(C)(2)(d) is unlawful under the CAA. The Ninth Circuit did not render a substantive ruling on the legality of the MDAQMD Rule 1304(C)(2)(d); rather, it remanded to the EPA to explain the EPA's finding that the MDAQMD rule was deficient, specifically in the context of the EPA's 1996 approval of the MDAQMD's NNSR program containing similar provisions to today's Rule 1304(C)(2)(d). The EPA therefore finds the MDAQMD SIP remains deficient with respect to Rule 1304(C)(2)(d) and inconsistent with CAA requirements. Regardless of the Ninth Circuit's remand, the EPA is required to promulgate the FIP, and it must do so by the consent decree deadline of January 10, 2025.[26]

*Comment A.1.3:* Commenter 02 states that since the MDAQMD made changes to address all but one of the six

deficiencies the EPA identified in the 2023 LA/LD, there is no longer a need to address those particular issues in the FIP other than to note that resolution has been reached and approval of those five issues is forthcoming.

Commenter 08 states that because CARB submitted the MDAQMD's revised rules to the EPA on August 7, 2024, it is the commenter's understanding that the FIP will only pertain to Simultaneous Emission Reduction ("SER") calculations under MDAQMD Rule 1304(C)(2)(d). The commenter states that with CARB's submission of the MDAQMD's revised rules, the deficiencies in the MDAQMD's rules are no longer broad in scope, nor do they affect multiple aspects of the program. The commenter urges the EPA to work cooperatively with the MDAQMD and not put the onus of the FIP on facilities.

Commenter 07 states that the MDAQMD has made many changes to its NSR rules to meet the requirements of the 1990 Clean Air Act and requests that the EPA reevaluate its decision to promulgate the FIP. Similarly, Commenter 05 states that the EPA should reconsider or postpone implementing the FIP until it can resolve its disagreement with the MDAQMD regarding Rule 1304(C)(2)(d). Commenter 09 urges the EPA to defer the FIP until the ongoing litigation between the EPA and the MDAQMD is resolved.

*Response to Comment A.1.3:* Section III.H of our FIP proposal described how SIP replacement of all or any part of the proposed FIP would work, noting that changes to the MDAQMD's rules, if approved into the SIP, could replace the corresponding requirements of the FIP.[27] The EPA received CARB's submission of the MDAQMD's revised rules (adopted by the MDAQMD on March 25, 2024) on August 7, 2024, which was after our July 9, 2024 proposed action. For the EPA to narrow the scope of the FIP to just the remaining issue—the quantification and generation of offsets under MDAQMD Rule 1304(C)(2)(d)—the EPA would first need to approve the August 7, 2024 CARB submittal containing the MDAQMD's revised NNSR rules, which requires a 30-day notice and comment period. We are currently reviewing the submission for completeness and substance, as required under section 110(k) of the CAA. Therefore, there is not enough time before the January 10, 2025 consent decree deadline to accommodate the required notice and comment rulemaking on any action the

---

[22] Id.

[23] *Center for Biological Diversity et al.,* v. *Regan,* No. 3:22–cv–03309–RS (N.D. Cal.). The consent decree, as entered by the court on June 15, 2023, is available in the docket for this action. On November 8, 2024, the parties stipulated to an extension of the consent decree deadline to January 10, 2025. The joint stipulation is available in the docket for this action.

[24] 82 FR 9158 (February 3, 2017).

[25] Cover Letter, MDAQMD March 22, 2021 Amendments to MDAQMD Regulation XIII—New Source Review and Rule 1600—Prevention of Significant Deterioration, sent from the MDAQMD to CARB. May 17, 2021, p. 2.

[26] On November 8, 2024, CBD and the EPA filed a joint stipulation to extend the original November 29, 2024 deadline to January 10, 2025. *Center for Biological Diversity et al.,* v. *Regan,* No. 3:22–cv–03309–RS (N.D. Cal.). This consent decree is also available in the docket for this action.

[27] 89 FR 56237, 56243.

EPA takes on the August SIP submittal.[28]

Case law also supports the conclusion that the EPA is not required to act on the MDAQMD's August 7, 2024 submittal prior to finalizing the FIP. As the court held in *Keystone-Conemaugh Projects LLC* v. *EPA,* a case in which the EPA promulgated a FIP before acting on a revised SIP submittal, CAA section 110(c) "contains no language *requiring* the EPA to act on the SIP revision before promulgating the FIP." [29] (Emphasis in original.) Likewise, as Commenter 02 indicates in its comment letter, the MDAQMD's revised NNSR rules submitted by CARB on August 7, 2024, does not include any revisions of MDAQMD Rule 1304(C)(2)(d).

Similar to the situation at issue in *Arizona ex rel. Darwin* v. *United States,* there is no reason to think that, after nearly five years of discussions of the MDAQMD's NNSR program between EPA and the MDAQMD, additional time to correct Rule 1304(C)(2)(d) would lead to MDAQMD's revising its NNSR program to resolve the deficiency.[30]

*Comment A.1.4:* Commenter 09 states that the proposed FIP is not necessary because the EPA already has authority under the existing MDAQMD rules to review applications for major facilities and enforce applicable federal NNSR requirements. This commenter states that MDAQMD Rule 1203(B)(1) requires that the EPA be given an opportunity to review and comment on applications for Federal Operating Permits (FOP), Significant Modifications to FOPs, and Renewals to FOPs. The commenter

states that the EPA already has the discretion and authority to deny applications for a Major Facility that it believes has not complied with applicable federal NNSR requirements.

*Response to Comment A.1.4:* The EPA disagrees with the comment. While the EPA can comment on, and enforce, Title V permits issued under the MDAQMD's approved CAA Title V program,[31] the Title V operating permit program is not the same permitting program as a NNSR pre-construction permitting program. Title I of the CAA has a separate requirement that the MDAQMD SIP contain a fully approved NNSR permitting program for the 2008 and 2015 ozone NAAQS.[32] Federal Operating Permits issued under Title V of the CAA (and under Regulation XII of MDAQMD's approved Title V program) are not the same as pre-construction NNSR permits issued under a SIP-approved program under Title I of the CAA, and the EPA's authority to review, comment on, and object to Title V permits does not remedy the deficiencies in the MDAQMD's NSR program, nor does the EPA's authority under Title V fulfill the EPA's FIP obligation under CAA section 110(c). MDAQMD Regulation XIII, which contains the MDAQMD's NNSR program, still needs to be approved into the SIP for the 2008 and 2015 ozone NAAQS. The EPA therefore has a statutory duty to promulgate a FIP as the result of its finding of failure to submit published in the **Federal Register** on February 6, 2017, and the EPA is now subject to a court order to either promulgate a FIP or approve a SIP submission that corrects all the deficiencies identified in the finding of failure to submit no later than January 10, 2025.[33]

### 2. Comments on MDAQMD Rule 1304(C)(2)(d)

*Comment A.2.1:* Commenter 01 asserts that the EPA erroneously assumed that SERs (Simultaneous Emissions Reductions) created under MDAQMD Rule 1304(C)(2)(d) (referred to by Commenter 01 as "1304(C)(2)(d) Offsets") are unlawful under the CAA. The commenter states that 1304(C)(2)(d) Offsets are created by a reduction in a source's allowable emissions that were fully offset in a previous action. Commenter 01 states that 1304(C)(2)(d) Offsets are adjusted to reflect otherwise required reductions, may only be used

to offset contemporaneous emission increases at the facility, and cannot be banked for future use. Commenter 01 further asserts that 40 CFR 51.165(a)(3)(ii)(J) does not relate to creditable emission reductions and that even that provision, through a cross-reference to the definition of "actual emissions" at 40 CFR 51.165(a)(1)(xii), allows permitting agencies to "presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit."

Commenter 06 similarly asserts that while 40 CFR 51.165(a)(3)(ii)(J) requires offsets to be determined by summing the difference between the allowable emissions after the modification and the actual emissions before the modification (as defined in paragraph (a)(1)(xii)), paragraph (a)(1)(xii)(C) allows the MDAQMD to presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

Therefore, Commenters assert, 1304(C)(2)(d) Offsets and the potential-to-emit to potential-to-emit or potential-to-potential (PTE-to-PTE) test are valid and consistent with sections 173(c)(1), 173(c)(2), and 182 of the CAA and the implementing regulations at 40 CFR 51.160–165.

*Response to Comment A.2.1:* The EPA disagrees with the assertion that the EPA made an erroneous finding that 1304(C)(2)(d) Offsets are inconsistent with statutory and regulatory requirements. As the EPA previously explained in the 2023 LA/LD and reiterated in our proposed action for the FIP, 1304(C)(2)(d) Offsets are inconsistent with the CAA and the EPA's regulations because they allow facilities to satisfy major NSR offset obligations using a baseline of allowable emissions before construction rather than a baseline of actual emissions before construction. We provide a more detailed explanation below.

CAA sections 173(a)(1)(A) and 173(c)(1) require that NNSR permits issued by states (or local air districts) pursuant to EPA-approved SIPs must require all proposed new or modified major sources that trigger NNSR to obtain sufficient offsetting emissions reductions. For example, section 173(c)(1) requires owners or operators of new or modified major stationary sources to obtain emission reductions that "assure that the total tonnage of increased emissions of the air pollutant from the new or modified source shall be offset by an equal or greater reduction, as applicable, in the *actual* emissions of such air pollutant from the same or other sources in the area."

---

[28] The CBD Consent Decree deadline was November 29, 2024, until CBD and the EPA agreed to extend the deadline, following the EPA's showing of need for an extension. Despite this extension, the EPA maintains that the extension of the CBD Consent Decree deadline to January 10, 2025, is still an insufficient amount of time to act on the MDAQMD's submittal and narrow the scope of the FIP before the deadline to finalize it.

[29] *Keystone-Conemaugh Projects LLC* v. *EPA,* 100 F.4th 434, 447 (3d Cir. 2024). The court further stated that ". . . if the EPA were required to act on each and every SIP revision submitted before it could issue a FIP, an untenable scenario could ensue. For instance, if a state were to submit multiple inadequate SIP revisions, it could effectively nullify the EPA's ability to issue a FIP and thus delay the implementation of any emission limits." (FN7)

[30] See, *Ariz. ex rel. Darwin* v. *United States,* 815 F.3d 519, 543–544 (9th Cir. 2016), in which the Ninth Circuit Court of Appeals upheld the EPA's combined partial SIP disapproval and FIP, which the agency promulgated to meet a consent decree deadline stemming from a previous finding of failure to submit. The court stated that "it is unlikely that a different outcome would have resulted if EPA had provided [the State] with additional time to correct its . . . SIP . . . [the State] made no effort to correct its SIP in light of these comments. There is no reason to think it would have done so after the Final Rule disapproving the SIP issued either."

[31] See 40 CFR part 70, appendix A.

[32] 42 U.S.C. 7410(a).

[33] *Center for Biological Diversity et al.,* v. *Regan,* No. 3:22–cv–03309–RS (N.D. Cal.). This consent decree is also available in the docket for this action.

(Emphasis added.)[34] Rule 1304(C)(2)(d) is inconsistent with section 173(c)(1) because it allows sources that have offset their allowable emissions at any point in time to avoid the CAA obligation to offset future increases in actual emissions from future major modifications. The EPA also disagrees with Commenter 01's assertion that Rule 1304(C)(2)(d) is consistent with CAA section 173(c)(2). In addition to the phrase referenced by the commenter, CAA section 173(c)(2) also states that ''[i]ncidental emission reductions which are not otherwise required by this chapter shall be creditable as emission reductions for such purposes if such emission reductions meet the requirements of [CAA section 173(c)(1)].''

The regulations at 40 CFR 51.165 require the District to use actual emissions as the baseline for determining the total tonnage of offsets that must be obtained by an owner or operator of a stationary source undergoing NNSR permitting. 40 CFR 51.165(a)(3)(i) requires:

[T]hat the offset baseline shall be the *actual* emissions of the source from which offset credit is obtained where . . . [t]he demonstration of reasonable further progress and attainment of ambient air quality standards is based upon the actual emissions of sources located within a designated nonattainment area for which the preconstruction review program was adopted. (Emphasis added.)

Moreover, under 40 CFR 51.165(a)(3)(ii)(J), which the EPA codified in 2002, SIPs ''shall . . . provide that'' ''[t]he total tonnage of increased emissions . . . that must be offset . . . shall be determined by summing the difference between the *allowable* emissions *after* the modification (as defined by paragraph (a)(1)(xi) of this section) and the *actual* emissions *before* the modification (as

defined in paragraph (a)(1)(xii) of this section)[.]'' (Emphasis added.)

Although Commenters 01 and 06 cite 40 CFR 51.165(a)(1)(xii) as authority to assert that MDAQMD is allowed to presume that the source-specific allowable emissions for a unit are equivalent to the actual emissions of the unit, any flexibility allowed under that provision is limited by section 40 CFR 51.165(a)(3)(i), which requires states or air districts that base reasonable further progress (RFP) and attainment planning on actual emissions[35] to use actual emissions as the baseline for all offset purposes.[36] The MDAQMD's RFP and attainment demonstrations are based on actual emissions, not allowable emissions.[37]

The EPA also disagrees with Commenter 01's suggestion that the EPA erroneously relied on 40 CFR 51.165(a)(3)(ii)(J) in its disapproval of Rule 1304(C)(2)(d) because that paragraph ''addresses calculating emission increases[,] not creditable emission reductions.''[38] Both provisions require the use of actual emissions as a baseline to calculate either the offset obligation (emission increase) or the satisfaction of that obligation (credit for emissions reductions), and the commenter does not dispute that 40 CFR 51.165(a)(3)(i) requires that emissions reductions for offset credits must use actual emissions as a baseline if actual emissions are used to demonstrate reasonable further

progress and attainment. The MDAQMD's RFP and attainment demonstrations are based on actual emissions—not allowable emissions.[39]

Based on the requirements of the CAA and its implementing regulations regarding offsets,[40] Rule 1304(C)(2)(d) does not ensure that the required quantity of emissions associated with a major modification in the MDAQMD will be offset and the provision is therefore not approvable in the SIP. Accordingly, the EPA must promulgate a FIP that contains the requirements stated in the CAA and its implementing regulations. The MDAQMD regulates an area that is classified as a Severe ozone nonattainment area and a ''Moderate'' PM$_{10}$ nonattainment area. It is important that sources in the nonattainment area make real reductions in emissions to offset emissions increases consistent with the goal of bringing the area into attainment for these air pollutants.

*Comment A.2.2:* Commenter 01 states that although 1304(C)(2)(d) Offsets result from reductions in allowable emissions, ''they produce real reductions in actual emissions.'' The commenter states that to ''originally secure the allowable emissions, the facility had to previously effect permanent actual emission reductions'' either by curtailing its own emissions or by purchasing emission reduction credits. The commenter states that if the facility agrees to permanently reduce those offset allowable emissions, the permanent emission reductions continue to exist. Commenter 01 then states that where those emission reductions ''exceed the volume of reductions required to sufficiently offset historical actual emissions (*i.e.,* the facility was able to curtail the source's emissions below the now eliminated allowable emission levels), those reductions exceed the obligation to assure that the total tonnage of increased emissions of an air pollutant from the new or modified source is offset by a reduction of actual emissions of that air pollutant in accordance with 42 U.S.C. 7503(c)(1) and in the quantities required by 42 U.S.C. 7511a.'' Commenter 01 further states that Rule 1304(C)(2)(d) complies with 42 U.S.C.

---

[34] In *New York* v. *EPA*, a case regarding the applicability of NSR requirements, the U.S. Court of Appeals for the District of Columbia held that ''the plain language of the CAA indicates that Congress intended to apply NSR to changes that increase actual emissions instead of potential or allowable emissions,'' when describing the definition of the term ''modification'' in CAA section 111(a)(4). 413 F.3d 3, 40 (D.C. Cir. 2005). CAA section 173(c)(1) is at least as clear as CAA section 111(a)(4) regarding the import of using actual emissions for baseline purposes—it specifically uses the term ''actual emissions,'' and it omits terms like ''potential to emit,'' ''emission limitations,'' or similar references when addressing the baseline. Although the D.C. Circuit did not construe the Act's offset requirement at section 173(c)(1), its interpretation of a similar statutory provision bearing on when a proposed source's emissions increases trigger the need for an NSR permit, CAA section 111(a)(4), is instructive.

[35] See 86 FR 24809, 24813 (May 10, 2021), ''The 2018 SIP Update explains that 2012 'stationary source emissions reflect actual emissions reported from industrial point sources' and include stationary aggregate sources, such as gasoline dispensing facilities. . . . MDAQMD Rule 107, 'Certification of Submissions and Emission Statements,' require[s] all stationary sources within the nonattainment area that emit more than 25 tons per year (tpy) or more of VOC or NO$_X$ to report and certify annual emissions.'' The MDAQMD does not assert or document use of allowables for RFP or attainment.

[36] Furthermore, Commenter 01 states the presumption incorrectly—40 CFR 51.165(a)(1)(xii)(C) allows the permitting authority to presume that allowable emissions are equivalent to the actual emissions, it does not say that the permitting authority may presume that the actual emissions are equivalent to the allowable emissions. This is important because a source's actual emissions will almost always be lower than its allowable emissions since an exceedance of the allowable emissions could constitute a violation of the permit.

[37] MDAQMD's 2008 and 2015 ozone NAAQS attainment plans are based on actual emissions. The 2008 ozone NAAQS plan is available at: *https:// ww2.arb.ca.gov/sites/default/files/classic/planning/ sip/planarea/wmdaqmp/2016sip_mdplan.pdf,* pp. 7, 34 (EPA approved this plan, see 86 FR 53223 (September 27, 2021).) The 2015 ozone NAAQS is available at: *https://www.mdaqmd.ca.gov/home/ showpublisheddocument/9693/ 638131029372000000,* pp. 4–5, 24, 80.

[38] Commenter 01 letter, p. 4, footnote 30.

[39] MDAQMD's 2008 and 2015 ozone NAAQS attainment plans are based on actual emissions. The 2008 ozone NAAQS plan is available at: *https:// ww2.arb.ca.gov/sites/default/files/classic/planning/ sip/planarea/wmdaqmp/2016sip_mdplan.pdf,* pp. 7, 34 (EPA approved this plan, see 86 FR 53223 (September 27, 2021).) The 2015 ozone NAAQS is available at: *https://www.mdaqmd.ca.gov/home/ showpublisheddocument/9693/ 638131029372000000,* pp. 4–5, 24, 80.

[40] See e.g., CAA sections 173(a)(1)(A), 173(c)(1) and 40 CFR 51.165(a)(3)(i), 40 CFR 51.165(a)(3)(ii)(G), and 40 CFR 51.165(a)(3)(ii)(J).

7503(c)(2) by identifying excess emission reductions and credits that exceeds the law's requirements as an available offset.

Moreover, Commenter 05 believes that emissions that were previously offset under the MDAQMD's rules represent actual emission reductions as required by CAA section 173(c)(1) and can be used for calculating emission reductions pursuant to Rule 1304(C)(2)(d). Commenter 05 asserts that fully offset emissions are not "paper reductions" because they represent actual emission reductions that are banked and used following approved regulatory procedures.

*Response to Comment A.2.2:* The EPA does not agree with the comment that 1304(C)(2)(d) Offsets result in real reductions in actual emissions, as required by the Act. Rule 1302(C)(2)(d) requires that (i) a federally enforceable emission limitation specify the PTE for the specific Emissions Unit; (ii) the resulting emissions change result in a decrease in emissions from the emissions unit; and (iii) any excess Simultaneous Emissions Reductions (SERs) generated from a calculation using the Rule are not eligible for banking. For emissions units that have allowable emissions limits that were fully offset at some point in the past, Rule 1304(C)(2)(d) allows *any* reduction in a facility's *allowable* emissions to be used to avoid CAA requirements to offset *actual* emissions increases.[41] As a hypothetical example, under MDAQMD Rule 1304(C)(2)(d), a facility might at the time of its original construction, "secure the allowable emissions," (using the commenter's phrasing) in the amount of 200 tons per year (tpy) through "permanent actual emission reductions" in that amount. If the facility subsequently submits a permit application to construct a project that would increase its actual emissions by 40 tpy, Rule 1304(C)(2)(d) allows the facility to decrease its allowable emissions limit of 200 tpy by a nominal amount, even just 1 tpy or less, to establish that the project would result in an "emissions decrease," rather than the actual emissions increase of 40 tpy that would actually occur and that would be subject to a requirement to offset the increase in actual emissions.[42] Rule

1304(C)(2)(d) is contrary to the CAA because it allows increases in actual emissions without *any* offsetting reductions in actual emissions. In other words, Rule 1304(C)(2)(d) allows real increases in emissions to be added to the air without requiring any offsetting decrease in real emissions.

It should also be noted that, in the hypothetical example presented in the previous paragraph, although the facility would have offset 200 tpy of emissions at the time of its initial construction by obtaining or surrendering 200 tpy of emissions reduction credits ("ERCs"), it used those ERCs to obtain a 200 tpy allowable emissions limit in that project.[43] Therefore, those ERCs are no longer available to offset subsequent increases in actual emissions resulting from future construction and modification projects. According to Commenter 01, Rule 1304(C)(2)(d) allows NNSR permit applicants to obtain permits by relying on previously relied upon emission reductions or previously surrendered emission reduction credits; however, because those emission reductions were used in a prior permitting action, they are not "surplus" under 40 CFR 51.165(a)(3)(ii)(G). 40 CFR 51.165(a)(3)(ii)(G) states: [The SIP] "shall further provide that . . . [c]redit for an emissions reduction can be claimed to the extent that the reviewing authority has not relied on it in issuing any [NNSR] permit . . . or the State has not relied on it in demonstrat[ing] attainment or reasonable further progress." Thus, 40 CFR 51.165(a)(3)(ii)(G) prevents facilities from re-using credits to obtain a permit for a major modification.

3. Comments Regarding EPA's 1996 Approval of 1304(C)(2)(d) Offsets

*Comment A.3.1:* Commenter 01 states that in 1996, EPA approved 1304(C)(2)(d) Offsets and that the associated 1995 technical support document explained that 1304(C)(2)(d) Offsets constitute real reductions in actual emissions, are not otherwise required by the CAA (once adjusted) and comply with CAA section 173. The commenter also states that since 1996 neither the relevant law nor the 1304(C)(2)(d) Offsets have materially changed.

Commenter 01 further states that the proposed FIP is arbitrary and capricious because the EPA fails to explain the reversal of its 1996 position in approving the District's Rule 1304(C)(2)(d) Offsets. The commenter states that EPA's contention that 1304(C)(2)(d) Offsets allow reductions on paper that do not represent real emissions reductions and that sources must reduce actual emissions to below historic actual emission levels to generate offset credit are complete reversals of the positions the EPA took in 1996 when it determined that SERs, including 1304(C)(2)(d) Offsets, constitute real reductions in actual emissions that are not otherwise required by the CAA and offset credit could be lawfully generated from reductions of surplus, fully-offset allowable emissions. The commenter states that, while the Administrative Procedure Act (APA) allows the EPA to reverse its policy on the 1304(C)(2)(d) Offsets, the EPA must "display awareness that it is changing position and show that there are good reasons for the new policy." [44]

*Response to Comment A.3.1:* The EPA's response to this comment serves as both our response to this comment in the context of the proposed FIP, the rulemaking for which the comment was submitted, and as the Agency's new final action to disapprove Rule 1304(C)(2)(d) in response to the Court of Appeals' ruling in the case *Mojave Desert Air Quality Management District* v. *EPA,* in which the Ninth Circuit granted petitioner MDAQMD's petition for review and remanded to the EPA "for further proceedings before the agency on an open record consistent with this decision." [45] The MDAQMD, in its comments on the EPA's proposal of the 2023 LA/LD, criticized the EPA's proposed rulemaking for failing to explain why the EPA approved similar provisions into the SIP in 1996 that it now finds deficient. The MDAQMD sought review of EPA's 2023 LA/LD action in the Ninth Circuit. The court agreed that the EPA failed to provide sufficient explanation in that action for the change in direction after 1996 and therefore directed the EPA to address the issue through further proceedings. Commenter 01—the MDAQMD—makes the comment again in the context of the FIP. Since both matters address the same subject, the EPA has determined that it is appropriate to use one notice

---

[41] Rule 1304(C)(2)(d)(ii) requires that "the resulting Emissions Change from a calculation using this provision is a decrease in emissions from the Emissions Unit(s)," hence why a source must demonstrate a reduction in allowable emissions from the subsequent modification.

[42] The example presented here is similar to a recent MDAQMD permitting action that the EPA described in the 2023 LA/LD. 88 FR 42258, 42263 (MDAQMD, "Preliminary Determination/

Decision—Statement of Basis for Minor Modification to and Renewal of FOP Number: 104701849 For: High Desert Power Project, LLC." December 21, 2022, p. 7.)

[43] These required offset quantities do not reflect the adjustment based on the area's nonattainment, which would require an even greater quantity of offsets for higher levels of nonattainment. CAA 182(d)(2), 40 CFR 51.165(a)(9).

[44] Citing *Ass'n of Irritated Residents* v. *U.S. Env't Prot. Agency,* 10 F.4th 937, 945 (9th Cir. 2021).

[45] Memorandum, *Mojave Desert Air Quality Management District* v. *United States Environmental Protection Agency,* 9th Circuit Court of Appeals No. 23–1411, September 5, 2024, p. 5.

to both respond to the MDAQMD's comments in the context of the FIP and to respond to the court's remand regarding the 2023 LA/LD disapproval of Rule 1304(C)(2)(d).

First, we note that significant regulatory changes occurred or were proposed in the 1990s, federally and in California, where the State and local air districts were implementing State legislation that was passed in 1988 to address air quality issues.[46] Later in this action, we discuss the CAA and regulatory requirements at the time of the EPA's October 1995 proposed approval and November 1996 final approval of the MDAQMD's NNSR rules. We then describe the Agency's contemporaneous consideration of options for regulatory flexibility during the 1990's. These documents, taken together, provide context for the regulatory landscape that existed during the EPA's review and approval of the MDAQMD's rules in 1995–1996. We also analyze our 1996 approval of MDAQMD's offset rules in light of the EPA's 2002 final rulemaking revising significant aspects of the NSR program ("2002 NSR Reform Rule).[47] In sum, this analysis is sufficient for the EPA, now, to conclude that the EPA's 1996 approval of the MDAQMD's offset rules was inconsistent with the CAA and its implementing regulations. Based on the documents discussed in this response, the EPA apparently believed in 1996 that the District's rules, which required the application of Best Available Control Technology (BACT) and offsets for a modification on the PTE of the entire facility rather than the modification alone, were sufficiently stringent to satisfy federal requirements.[48] As we explain in this response and in our responses to comments A.2.1 and A.2.2, however, our justification in 1996 for approving MDAQMD rule provisions that were similar to Rule 1304(C)(2)(d) is deficient, the EPA's 2002 NSR Reform Rule did not include revisions that would ratify or authorize MDAQMD's approach, and therefore our 2023

disapproval of Rule 1304(C)(2)(d) is correct.

Federal Regulatory Scheme Regarding Offsets in Effect in 1996

On August 7, 1980, the EPA promulgated NSR rules for attainment and nonattainment areas.[49] The 1980 NSR rulemaking codified 40 CFR 51.18(j)(3)(i), requiring an offset baseline to be based on actual emissions of the source from which offset credit is obtained where demonstrations of reasonable further progress and attainment are based on actual emissions.[50] As stated in the rule's preamble, the EPA's rationale was, "to be consistent with RFP, sources must reduce their actual, rather than their allowable, emissions. Otherwise, sources could claim credit for offsets in situations where the offset would actually interfere with RFP." [51] On November 7, 1986, the EPA promulgated NSR rules specifically for nonattainment areas at 40 CFR 51.165 and codified the text at 40 CFR 51.18(j)(3)(i) into 40 CFR 51.165(a)(3)(i), where it was in 1996, in 2023 (at the time of our LA/LD rulemaking), and today.[52]

The EPA's 1980 NSR rulemaking also codified 40 CFR 51.18(j)(3)(g), allowing credit for emissions reductions only "to the extent that the reviewing authority has not relied on [the reductions] in issuing any permit under regulations approved pursuant to 40 CFR 51.18 or the state has not relied on [the reductions] in demonstrating attainment or reasonable further progress." [53] The EPA's 1986 NNSR rulemaking codified the text at 40 CFR 51.165(a)(3)(ii)(G), where it was in 1996, in 2023 (at the time of our LA/LD rulemaking) and today.[54]

Likewise, EPA guidance issued during the 1990s addressed the quantity of emissions to be offset. Specifically, in the proposed rulemaking action titled, "General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990," the EPA clarified that CAA section 173(c)(1) "provides that emissions increases from the new or modified source must be

offset by real reductions in actual emissions." [55]

The EPA's 1995–1996 Rulemaking for the MDAQMD's 1993 and 1996 Adopted Versions of Rule 1304(C)(2)(d)

On October 27, 1993, the MDAQMD adopted a series of NSR rules, which CARB submitted to the EPA as a SIP revision on March 29, 1994.[56] On October 31, 1995, the EPA published a proposed action in the **Federal Register** to approve the rules contingent upon the MDAQMD's adoption and submittal, as a SIP revision, of revised rules that would correct a number of deficiencies that EPA had identified.[57] The EPA based its proposed "approval with a contingency and disapproval in the alternative" on a set of draft rules that the MDAQMD transmitted to the EPA on October 11, 1995 ("October 11, 1995 draft rules") that MDAQMD had not yet adopted or submitted to CARB.[58] The EPA's proposed action explained that the 1993 adopted version of the rules contained numerous deficiencies that precluded full approval but that the October 11, 1995 draft rules were intended to address those deficiencies and that the EPA's proposed approval was conditioned upon MDAQMD's adoption and submission of the revised rules.[59] Thus, the EPA's proposed rule and technical support document (TSD) summarized the rules as adopted on March 29, 1993, including bases for findings of rule deficiencies, as well as statements regarding the October 11, 1995 draft rules that the MDAQMD had

---

[46] For example, the California Clean Air Act uses different offsets thresholds than the federal regulations. See California Health and Safety Code sections 40918, 40919, 40920, and 40920.5; compare to 40 CFR 51.165. California air districts must implement State requirements under California law and satisfy the federal requirements under the CAA and its implementing regulations. Any provision that conflicts with the CAA and its implementing regulations is not approvable.

[47] 67 FR 80186, 80205 (December 31, 2002).

[48] 1995 TSD accompanying the EPA's proposed rule (60 FR 55355 (October 31, 1995)) ("1995 TSD"), p. 17.

[49] 45 FR 52676 (August 7, 1980).

[50] Id. at 52745.

[51] Id. at 52728.

[52] 51 FR 40656, 40672 (November 7, 1986); 40 CFR 51.165(a)(3)(i) (1996) (a copy of the CFR as of July 1, 1996 is in the docket for this rulemaking). See also, 57 FR 13498, 13552 (April 16, 1992) ("The EPA interprets section 173(a)(1)(A) to ratify current EPA regulations requiring that the emissions baseline for offset purposes be calculated in a manner consistent with the emissions baseline used to demonstrate RFP.")

[53] 45 FR 52746.

[54] 51 FR 40672; 40 CFR 51.165(a)(3)(ii)(G) (1996).

[55] 57 FR 13498, 13553 (April 16, 1992). The EPA further stated that if RFP and attainment plans "are based on allowable emissions, offset credit for reductions in allowable emissions . . . is appropriate, but will be deemed inadequate if there is not a real reduction in actual emissions that equals or exceeds, as applicable, the increase in emissions resulting from the operation of the major new or modified source." Id.

[56] Although EPA has not been able to locate a copy of the NSR rules as adopted by the MDAQMD in October 1993, we are able to determine the adoption date from the MDAQMD's headings on later versions of the rules that provide a chronology of adoption dates. The 1995 TSD and proposed rulemaking reference the submittal date. 1995 TSD at 2; 60 FR 55356.

[57] 61 FR 58133 (November 13, 1996). In the proposed rulemaking, the EPA proposed "to approve with a contingency, and disapprove in the alternative." 60 FR 55355 (October 31, 1995).

[58] 60 FR 55355.

[59] Id. ("The submitted rules contain a number of deficiencies that prevent EPA from approving them as revisions to the SIP. However, MDAQMD has agreed to correct these deficiencies, and has sent draft rules . . . to EPA which contain acceptable language. This proposed approval is therefore contingent upon MDAQMD adopting and submitting to EPA revised rules which correct the deficiencies identified in this document before EPA promulgates a final rulemaking on the submitted rules.")

committed to adopt and submit to EPA before EPA finalized its rulemaking.

In the EPA's proposed action on this submission, the EPA concluded that MDAQMD's Rule 1306 "Calculating Emissions Changes" as adopted in March 1993 was deficient because the rule uses a source's pre-modification PTE rather than pre-modification actual emissions, as the baseline to calculate the offset requirement and that the method is not acceptable unless the source has already offset its entire pre-modification PTE.[60]

In the 1995 TSD accompanying the EPA's proposed rule, the EPA further explained that Rule 1306 as adopted in March 1993 "has several deficiencies that prevent its full approvability by EPA" and provided a list of deficiencies, "along with the changes which would make the rule approvable." As stated in the 1995 TSD:

> The rule uses a source's potential to emit as a baseline for calculating emissions changes, rather than its actual emissions. In general, use of potential to emit in this calculation is unacceptable, however, for most purposes in this rule it is acceptable. For example, the submitted rules require the application of BACT and offset for a modification if the PTE of the *entire source* (not just the increase caused by the modification) would exceed the applicable threshold after the modification. Thus, applicability is determined by the total PTE of the source, not the size of the calculated emissions change resulting from the modification. However, this method is not acceptable for calculating the amount of offsets required as the result of an increase, unless the source has already offset its entire PTE.[61]

Section 1305(A)(2)(b)(iii) of the proposed revision of the District's rules contains the necessary changes to these provisions.[62]

---

[60] Id. at 55356 ("This section uses a source's pre-modification potential to emit (PTE), rather than its pre-modification actual emissions, as the baseline for calculating the offset requirement for major modifications in nonattainment areas. This method is not acceptable unless the source has already offset its entire pre-modification PTE. The District must amend the rule to calculate the offset requirement in this case as the source's new PTE minus the source's pre-modification actual emissions.")

[61] 1995 TSD, p. 17.

[62] Id. at 17. In March 1996, the MDAQMD adopted Rule 1305(A)(2)(b)(iii), which the EPA approved into the California SIP in November 1996, and is the equivalent of current Rule 1304(C)(2)(d). Rule 1305(A)(2)(b)(iii) stated: "For emissions increases from a Modification to a Major Facility the base quantity of Offsets shall be determined as follows: (a) When the Modification is a Major Modification to a Major Facility within a nonattainment area, the base quantity of Offsets shall be the amount equal to the difference between the Facility's Proposed Emissions and the HAE [historic actual emissions] unless the Facility's HPE [Historic Potential Emissions] has been completely offset in prior permitting actions pursuant to this Regulation; or (b) The amount equal to the difference between the Facility's Proposed Emissions, as modified, and the HPE."

(Emphasis in original.)

The statements in the EPA's proposed rule and TSD are brief. It appears, however, that we concluded that the MDAQMD's approach—using PTE (*i.e.,* allowable emissions) rather than actual emissions as a baseline to evaluate NNSR applicability for modifications— would be acceptable because it would require the MDAQMD to impose BACT and offsets requirements for any modification at a major source, regardless of whether the modification qualified as "significant," whereas the EPA's regulations apply BACT and Lowest Achievable Emission Rate (LAER) to facility modifications only if the source is already major and the emissions increase from the modification itself is "significant," or if the modification is itself above the applicable major source threshold. Therefore, it appears that applying this rationale, the EPA found that the MDAQMD's approach to determining NNSR applicability for modifications was at least as stringent as the federal approach and therefore was approvable.

As described in the EPA's final rulemaking, the MDAQMD adopted revised NSR rules on March 25, 1996, that CARB submitted as a SIP revision to the EPA on July 23, 1996.[63] The EPA's final rulemaking contains no additional analysis, but it simply states: "The submitted rules contain the changes necessary for approval, in a manner that is identical to that described in the TSD for the proposed approval." [64] As part of this final action, the EPA approved MDAQMD rules, such as 1304(C)(1)(b), that allow SERs to be based on reductions in PTE (allowable emissions) and that allow such SERs to satisfy federal offset obligations.

Thus, we have been unable to discern in the EPA's 1995–1996 rulemaking documents any legal rationale or support for the MDAQMD's use of a PTE baseline to determine that the amount of offsets is acceptable if a "source has already offset its entire PTE." The statement is inconsistent with statutory and regulatory requirements that existed at the time (and are still in effect), such as CAA section 173, 40 CFR 51.165(a)(3)(i) and 40 CFR 51.165(a)(3)(ii)(G).[65] Furthermore, the EPA appears to have mistakenly concluded in 1995–1996 that the MDAQMD's approach for applicability would be sufficient to consistently

---

[63] 61 FR 58133.

[64] Id. at 58134.

[65] As noted elsewhere, the provision is also inconsistent with 40 CFR 51.165(a)(3)(ii)(J), which the EPA promulgated in 2002.

ensure issuance of NNSR permits that would be at least as stringent as required by federal law. First, as we have explained in our response to comment A.2.2, MDAQMD Rule 1304(C)(2)(d) allows facilities that are "fully offset" at any time in the past to increase actual emissions without having to offset those actual emission increases. These increases would be impermissible if MDAQMD applied the federal requirements.[66] Second, we note that the EPA's regulations at 40 CFR 51.165(a)(2)(ii) allow states to use different calculation methodologies to determine applicability upon the state's demonstration that its approach is at least as stringent as the EPA's approach. The EPA's regulations do not contain a similar provision that would allow states to apply an alternative methodology to calculate the quantity of required offsets based on a demonstration that the alternative is more stringent.

### The 80 Percent Compromise for Calculating Emissions Increases

In a letter dated October 30, 1995, from the EPA to the MDAQMD, transmitting the 1995 TSD that provided the EPA's analysis of the MDAQMD's October 1993 NSR rules, the EPA referenced an NSR flexibility option that the EPA, the MDAQMD, and CARB had discussed since at least 1993. The flexibility option pertains to how an applicant could calculate emissions changes at its facility, and it is therefore relevant to the offset generation and quantification issues in 1304(C)(2)(d). This portion of the EPA's response to comment A.3.1 focuses on that flexibility option, beginning with the earliest document EPA staff were able to locate on the subject.

A letter dated September 8, 1993, from CARB to MDAQMD documents that the EPA had provided a comment regarding the MDAQMD's calculation procedures during MDAQMD's process of amending its NSR rules.[67] Specifically, the letter documents that the EPA had identified a conflict in determining "historic emissions" (*i.e.,* emissions that could be used as a baseline in evaluating emissions changes resulting from facility modifications) between federal requirements requiring the use of actual

---

[66] We provide a hypothetical example in our response to comment A.2.2 and reference the real-world example that we described in our 2023 LA/LD, wherein a facility that should have been required to obtain offsets under the federal requirements was exempted from doing so under MDAQMD Rule 1304(C)(2)(d).

[67] CARB Letter to MDAQMD, dated September 8, 1993.

emissions and California guidelines that allowed PTE. In an apparent attempt to resolve this conflict, the letter references a "compromise" that "will allow potential to emit to be used in some instances but actual emissions in others." [68] The letter included an enclosure with text for the MDAQMD to include in its Rule 1306 stating that the EPA had "tentatively" agreed to the draft text. Included in the draft text are definitions for the terms "historic emissions" and "normal operations" as follows:

*Historic Emissions:* The potential to emit of an existing emissions unit prior to modification. In determining the potential to emit, daily emission limitations shall be treated as part of an emission unit's design only if the limitations are representative of normal operations, or, if the facility has provided offsets for previous permitting actions . . .

*Normal Operations:* Usual or typical daily operating of an emissions unit resulting in actual emissions which are at least 80% of the specific limits contained in the unit's authority to construct or permit to operate.

Based on this letter, it appears that the EPA agreed to allow emissions changes from facility modifications to be calculated using a baseline of 80 percent of a facility's allowable emissions, rather than actual emissions, which, as the letter acknowledges, was the federal requirements for such calculations. The letter does not provide sufficient detail to determine whether the calculations in question were for the purpose of determining emissions changes for applicability or for determining the offset obligation or both. The letter also does not provide any legal analysis or support to justify the use of allowable emissions as a baseline in situations in which actual emissions are at least 80 percent of allowable emissions, in contrast to the EPA's statutory and regulatory requirements to use actual emissions to calculate emissions changes when the air district uses actual emissions for reasonable further progress and attainment planning purposes.

Later, in the 1995 TSD transmittal letter, the EPA wrote:

The proposed rules contain one provision that should be removed prior to adoption and submittal of the rules. This provision, located at 1304(C)(3)(a) and 1305(B)(2)(b)(i), allows for reductions in a facility's potential to emit to be used as simultaneous emission offsets if the facility's actual emissions were equal to or greater than 80% of its potential emissions. EPA has discussed this provision with the California Air Resources Board and

both agencies agree that it should not be included in the District's rules.[69]

As explained earlier in this response, the EPA's 1995 TSD (transmitted with this letter) also discussed the use of PTE as a baseline to calculate offset obligations, but it allowed that approach if a source had already offset its entire PTE. There is no explanation in the October 30, 1995 letter or the 1995 TSD to reconcile the EPA's apparent position that PTE *could not* be used to calculate the offset requirement if actual emissions were equal to or greater than 80 percent of PTE (as expressed in the October 30, 1995 letter) with the EPA's stated position that PTE *could be* used to calculate the offset requirement if the source's PTE had been fully offset in a previous permitting decision (as stated in the 1995 TSD).

A subsequent document with the handwritten notation "Mojave Compromise," is possibly relevant. This document appears to have been sent by CARB to the MDAQMD on November 14, 1995, and reflects discussions between EPA and the MDAQMD ("November 14, 1995 Memo").[70] The document states:

*General:* Rule 1304, Section (C)(3)(a), states that "actual emissions reductions may be calculated using a facility's "historic potential to emit" if the "historic actual emissions" of the emissions unit(s) prior to modification is greater than or equal to 80 percent of the "historic potential to emit" for that emission unit.

The ARB and the U.S. Environmental Protection Agency have agreed that in one specific case a facility may use an emission unit's "historic potential to emit" in lieu of the emission unit's "historic actual emissions." Both agencies agreed that districts could use this "compromise" when determining the applicability of federal New Source Review. The intention of this "compromise" was to give a facility more flexibility when making this determination. It was not intended to be used when calculating the quantity of offsets required for mitigation by a facility. The use of "historic potential to emit" in lieu of "historic actual emissions" should only be used in the "federal netting process," and it only applies to quantifying emissions increases.

As you know, 40 CFR 51.165 (a)(1)(vi), which defines "net emissions increase," in general stipulates that all increases/decreases

must be actual emissions. This compromise allowed a facility to reduce the increase in emissions by a factor no greater than 20 percent. Unfortunately, the District has also applied the "compromise" provision when calculating emission decreases in the netting process.

The District has included the above provision in both Rules 1304 and 1305. The net effect of using the "compromise" when calculating emission decreases is that it generates "paper credits." Further, Rule 1305, Section (B)(2)(b) proposes to allow the use of these credits to offset "actual" emission increases.

We strongly recommend that the District delete Subsection (C)(3)(a) from Rule 1304, and Subsection (B)(2)(b)(i) from Rule 1305. In addition, we recommend that definitions (V) "Historic Potential Emissions" and (DD) "Normal Operation" in your current Rule 1302 (Amended 10/27/93) be added to your proposed Rule 1301. Once these changes have been made, the District should apply the "compromise" provision as intended by the ARB and U.S. EPA.[71]

Based on the November 14, 1995 Memo, it appears that the EPA generally objected to the MDAQMD's use of PTE as a baseline when calculating emissions decreases, either in the context of determining NSR applicability or calculating an offset obligation, but would allow the use of PTE as a baseline when calculating emissions increases if PTE was within 80 percent of actual emissions. However, these documents (CARB's September 8, 1993 letter to the MDAQMD, the EPA's October 30, 1995 TSD transmittal letter, and the November 14, 1995 Memo) contain no explanation to reconcile (i) the objection by CARB and the EPA to use of PTE to calculate emissions decreases because such an approach would "generate 'paper credits,'" which could then be used to offset actual emission increases" (as stated in the November 14, 1995 Memo) with (ii) the acceptance by CARB and the EPA of the MDAQMD's use of PTE to calculate simultaneous emission reductions if an emissions unit's PTE had been fully offset in a previous permit action (as stated in the 1995 TSD).[72]

In a letter dated January 26, 1996 from the MDAQMD to CARB, with a courtesy copy to the EPA, the MDAQMD proposes an alternative to the compromise that had previously been discussed among the three agencies.[73] The letter references the MDAQMD's new text for Rules 1303 and 1304 as "attached," but the EPA has not been

---

[68] Id.

[69] 1995 TSD, Transmittal Letter.

[70] CARB Memo, November 14, 1995. The November 14, 1995, CARB Memo appears substantially similar to an October 20, 1995, CARB Memo, apparently transmitted by CARB to the EPA, that reflects CARB's comments regarding the MDAQMD's draft rules, specifically Rule 1304 "Emissions Calculations" and Rule 1305 "Emissions Offsets." The October 20, 1995, CARB memo also references communications between the EPA, CARB, and the MDAQMD regarding MDAQMD Rules 1304, "Emissions Calculations" and 1305, "Emissions Offsets."

[71] November 14, 1995, CARB staff comments on 1995 MDAQMD draft Regulation XIII.

[72] See 1995 TSD, p. 17 (regarding MDAQMD Rule 1306 (as adopted in March 1993).

[73] Letter from the MDAQMD to CARB, dated January 26, 1996.

able to locate these attachments. The EPA is also unable to locate copies of the October 11, 1995 draft rules; therefore, the EPA is unable to track revisions to the rules MDAQMD adopted in October 1993 to the rules MDAQMD adopted in March 1996, which the EPA approved in November 1996. Although it is apparent from the correspondence among the EPA, CARB and the MDAQMD that the agencies were involved in multi-year discussions over the calculation of emissions increases and decreases and the application of emissions decreases to new projects, it is not clear why the EPA and CARB objected to the use of PTE to calculate offsets (as well as emissions decreases related to the applicability analysis) but allowed the use of PTE to calculate offsets if emissions units had been fully offset as part of previous permitting action.

1996 Proposal To Revise the Federal NSR Rules and 2002 NSR Reform Rule

While EPA Region 9 was reviewing the MDAQMD's proposed revisions to its NSR program in 1993–1996, the EPA was also in the process of revising its nationally applicable NSR regulations for major stationary sources in both attainment and nonattainment areas based on input from stakeholders from industry, state and local agencies, and environmental organizations. Towards this end, in July 1996, the EPA published in the **Federal Register** a proposed rulemaking to comprehensively overhaul the federal NSR program for the first time in 15 years.[74] The proposal provides a roughly contemporaneous insight to concepts that the EPA was exploring to provide states greater flexibility to customize their own NSR programs.[75] One such concept was a revision to the NSR regulations to allow the use of the PTE-to-PTE test for NSR applicability as well as for calculating offsets, netting credits, and other emissions reductions credits.[76] This proposal, referred to as the "Exhibit B approach," would provide sources with the alternative of using their hourly potential emissions to determine baselines for NSR applicability and other NSR purposes.[77] The EPA acknowledged in the proposed rulemaking that the Exhibit B approach would provide flexibility requested by industry, but we expressed concern for environmental consequences, providing examples of how the proposal could lead to increases in actual emissions

that would escape NSR review.[78] The EPA's analysis of potential environmental impacts of the proposal revealed that, in the two states studied, actual emissions comprised 30 to 86 percent of allowable emissions, depending on source category and pollutant.[79] Because the analysis showed actual emissions were substantially below allowable emissions levels, the use of an emissions baseline based on actual or allowable emissions could significantly impact whether a source would need to comply with NSR requirements.

The EPA's 1996 proposed rulemaking included the following analysis of a PTE-to-PTE test for calculation of offsets:

[Exhibit B's] proposal on offsets may conflict with the 1990 Amendments. That is, section 173(c) of the Act requires that a source secure sufficient emissions reductions to assure that "the total tonnage of increased emissions of the air pollutant from the new or modified source shall be offset by an equal or greater reduction . . . in the *actual emissions* of such air pollutants." Thus, offsetting emissions reductions (including emissions reduction credits used for offsets) must be calculated in terms of actual emissions.[80]

(Emphasis in original.)

The EPA sought comment in the 1996 proposed rulemaking as to whether the Exhibit B proposal "is consistent with the air quality planning goals of the NSR program. That is, while Exhibit B could allow significant increases in actual emissions to be unreviewed, section 173 of the Act required offsets to be based on actual emissions."[81]

After seeking comment on the Exhibit B proposal in 1996, the EPA ultimately decided not to adopt it for reasons explained in the 2002 NSR Reform Rule (which also added 40 CFR 51.165(a)(3)(ii)(J)). The EPA reiterated that the Exhibit B proposal would allow sources to "use this potential-to-potential test for NSR applicability, as well as for calculating offsets, netting credits, and other ERCs."[82] While acknowledging the "maximum flexibility" the PTE-to-PTE test would provide to existing sources, the EPA also re-stated concerns associated with the calculation methodology for calculating emission reductions to be used for netting or ERCs, stating that Exhibit B would allow facilities to

generate netting credits and ERCs for offsets based on potential hourly emissions, even if never actually emitted, which could allow greater actual emissions increases without any preconstruction review.[83]

In the 2002 NSR Reform Rule, the EPA acknowledged that it was unable to determine the specific environmental impact from using a PTE-to-PTE test, but we observed that its analysis showed that typical source operation frequently results in actual emissions that are below allowable emission levels.[84] This observation reinforces concerns that a calculation methodology that relies on allowable emissions will fail to regulate actual emissions increases. Regarding the offsets implications of Exhibit B specifically, the EPA wrote in the response to comments that:

[The Exhibit B] methodology would also be problematic for generating ERCs, particularly for use as offsets. The use of potential emissions for offset credits is in direct conflict with the Act. Under section 172(c) of the Clean Air Act, emissions offsets must be based on reductions in actual emissions. Allowing sources to get credit for reductions in potential emissions would result in "paper" credits, and could allow sources to receive credit for reducing emissions that never actually occurred. Thus, our rules have not changed with regard to the calculation of reductions in actual emissions for offsetting purposes.[85]

It is important to note that, along with rejecting Exhibit B, the 2002 NSR Reform Rule also codified at 40 CFR 51.165(a)(3)(ii)(J) a specific requirement that, for each major modification, a source must offset the difference between the allowable emissions after the modification and the actual emissions before the modification for each emissions unit.[86] The EPA's statement in the response to comments that it was not changing regulatory requirements for offset calculations establishes that the addition of new section 40 CFR 51.165(a)(3)(ii)(J) was merely a codification of an existing requirement for calculating offsets.[87]

---

[74] 61 FR 38250, 38251 (July 23, 1996).

[75] Id.

[76] Id. at 38268.

[77] Id. at 38268–69.

[78] Id. at 38269. The EPA also acknowledged, however, that the "magnitude of the environmental impact of Exhibit B, if promulgated, is difficult to predict." Id. at 38270.

[79] Id. at 38270.

[80] Id. at 38269, footnote 31.

[81] Id. at 38270.

[82] 67 FR 80186, 80205.

[83] Id.

[84] Id.

[85] "Technical Support Document for the Prevention of Significant Deterioration and Nonattainment Area New Source Review Regulations," November 2002, page I–6–11.

[86] See 67 FR 80186, 80249.

[87] "Technical Support Document for the Prevention of Significant Deterioration and Nonattainment Area New Source Review Regulations," November 2002, page I–6–11. The need to establish a regulatory requirement for calculating offsets was perhaps necessary in light of the numerous changes to NSR applicability promulgated throughout the 2002 NSR Reform Rule. See, e.g., 67 FR 80186, 80189–91; see also, 67 Continued

Conclusion: The EPA's 1996 SIP Action Was Inconsistent With the Act and Regulations

For the reasons we articulate today, and that we articulated in the 2023 LA/LD, the MDAQMD's program that we approved in 1996 is not consistent with the requirements of the Act and its implementing regulations. The EPA acknowledges that its 2023 disapproval of Rule 1304(C)(2)(d) is at odds with its 1996 approval of the MDAQMD's rules that allowed facilities to use emissions reductions that were previously relied upon as a basis for using a PTE-to-PTE test to not require a project to obtain offsets. The EPA's 1995 TSD and 1995–1996 rulemaking approving the MDAQMD's NNSR program do not explain how the EPA reconciled the MDAQMD's program's departure from the requirements that existed at the time (and continue to exist) in CAA section 173(c)(1), 40 CFR 51.165(a)(3)(i), 40 CFR 51.165(a)(3)(ii)(G), and the not-yet-codified 40 CFR 51.165(a)(3)(ii)(J), which the EPA promulgated in 2002. The EPA's 2023 LA/LD, however, does explain our disapproval of Rule 1304(C)(2)(d) in light of applicable statutory and regulatory requirements.

The preceding paragraphs describe the EPA's interest in exploring options for flexibility contemporaneously with our 1995–1996 rulemaking to approve MDAQMD's NNSR program. For example, from at least 1993 to 1996, the EPA, CARB, and the MDAQMD discussed how to calculate emissions changes for applicability, netting, and ERC purposes. The changes to the MDAQMD program, and the EPA's approval of them, occurred during the years following the passage of the California Clean Air Act (1988), the Federal Clean Air Act Amendments of 1990, and the numerous associated statutory deadlines for the EPA to act on revised NSR programs in the 1990s (similar to today, there were nearly three dozen air districts in California in the 1990s). In July 1996, between the EPA's proposed contingent approval of the MDAQMD's NNSR rules in October 1995 and its final approval of those rules in November 1996, the EPA proposed changes to the federal NSR program that contemplated a PTE–PTE test for NSR applicability and offsets. The timing of the many regulatory changes and proposals that occurred around the same time as the EPA's

approval of the MDAQMD's NNSR program is thus helpful context for understanding the EPA's unexplained approval of MDAQMD's provisions that conflict with CAA requirements. However, the EPA did not approve any regulatory revisions during the 1990s or thereafter that would allow the MDAQMD's program, as it existed in 1996 or 2023, to be approved. In 2002, the EPA clarified in its rejection of the 1996 Exhibit B proposal that we were not revising our rules regarding the calculation of reductions in actual emissions for offsetting purposes.[88] Furthermore, in 2002, the EPA codified 40 CFR 51.165(a)(3)(ii)(J) to make explicit in its regulations a requirement for major stationary sources to calculate their offset obligation using a pre-modification baseline of actual emissions (at least when the air district uses actual emissions for reasonable further progress and attainment planning purposes).

The MDAQMD's 1994, 2008, and 2015 attainment plans demonstrate RFP and attainment based on actual emissions, not allowable emissions.[89] Under 40 CFR 51.165(a)(3)(i), which was promulgated by the EPA in 1980, substantially predating the EPA's 1996 approval of the MDAQMD's NNSR rules, the offset baseline must be the actual emissions of the source from which the credit is obtained. Likewise, 40 CFR 51.165(a)(3)(ii)(G) prevents sources in the MDAQMD from relying on emissions reductions that were utilized in a prior permitting action. The EPA's 1996 approval of the MDAQMD's rules does not provide a justification for its conclusions that the MDAQMD's rules satisfied the offsetting requirements of the CAA or its implementing regulations. The EPA recognizes that we are changing our position as stated in our 1995–1996 rulemaking on the MDAQMD's rules on the specific question of whether Rule 1304(C)(2)(d) is consistent with the Act and the NSR regulations. This change in position is because the provisions that we approved in 1996 (which, as noted

above, are substantially similar to Rule 1304(C)(2)(d)) were not consistent with the CAA or our regulations at that time. As we wrote in the 1996 and 2002 NSR Reform rules, we are concerned about the potential environmental impacts of an NNSR program such as MDAQMD's that would use the PTE–PTE test along with or because of a unique offset generating scheme. The codification of 51.165(a)(3)(ii)(J) in 2002 meant that, when the EPA analyzed the MDAQMD's NNSR program for approvability in the context of the 2008 ozone NAAQS implementation rule, the program's inconsistency was apparent. MDAQMD Rule 1304(C)(2)(d) is not approvable, even though the EPA approved similar text in 1996.

4. Comments Regarding Reliance

*Comment A.4.1:* Commenter 01 states that while the EPA may reverse its policy on 1304(C)(2)(d) Offsets, the APA requires the EPA '' 'to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns,' considering alternatives to accommodate such interests.'' [90] The commenter states that the EPA is effectively nullifying valuable 1304(C)(2)(d) Offsets that were purchased with costly reductions in actual emissions on the EPA's promise that they could later be used to offset certain emission increases. The commenter also states that the proposed FIP does not consider these reliance interests or alternatives to the immediate invalidation of the 1304(C)(2)(d) Offsets that have existed with EPA's blessing for over 25 years.

*Response to Comment A.4.1:* The EPA has provided a comprehensive explanation in our response to comment A.3.1 regarding our changed position on the approvability of MDAQMD Rule 1304(C)(2)(d). Moreover, the EPA disagrees with the comment to the extent it is asserting that this action invalidates significant reliance interests. Commenter 01 cites *Dep't of Homeland Sec.* v. *Regents of the Univ. of California* as support for its assertion that there are reliance interests stemming from Rule 1304(C)(2)(d) and that the EPA failed to consider them in disapproving the provision.[91] In *Regents,* the Supreme Court ruled against the government, finding that the government's decision to rescind the Deferred Action on Childhood Arrivals (''DACA'') program was arbitrary and capricious under the

---

FR 80241 (''Our decision is based primarily on our belief that the NSR program will work better as a practical matter and will produce better environmental results if all five of the new applicability provisions are adopted and implemented.'')

[88] ''Technical Support Document for the Prevention of Significant Deterioration and Nonattainment Area New Source Review Regulations,'' November 2002, page I–6–11.

[89] MDAQMD 1994 ROP Plan, October 5, 1994. MDAQMD's 2008 and 2015 ozone NAAQS attainment plans are based on actual emissions. MDAQMD's 2008 and 2015 ozone NAAQS attainment plans are based on actual emissions. The 2008 ozone NAAQS plan is available at: *https://ww2.arb.ca.gov/sites/default/files/classic/planning/sip/planarea/wmdaqmp/2016sip_mdplan.pdf,* pp. 7, 34 (EPA approved this plan, see 86 FR 53223 (September 27, 2021).) The 2015 ozone NAAQS is available at: *https://www.mdaqmd.ca.gov/home/showpublisheddocument/9693/638131029372000000,* pp. 4–5, 24, 80.

[90] Citing *Dep't of Homeland Sec.* v. *Regents of the Univ. of California,* 591 U.S. 1, 30, 33 (2020).
[91] 591 U.S. 1, 30, 33 (2020).

**Federal Register** / Vol. 89, No. 249 / Monday, December 30, 2024 / Rules and Regulations **106345**

APA.[92] DACA recipients (as well as their parents, under the related "DAPA" program) "enjoy[ed] . . . forbearance, work eligibility, and other benefits" under the programs.[93] The Supreme Court held that the government failed to provide a "reasoned explanation for its action" because it "failed to consider the conspicuous issues of whether to retain forbearance and what if anything to do about the hardship to DACA recipients." [94]

*Regents,* however, is materially distinguishable from the EPA's disapproval of Rule 1304(C)(2)(d); the case does not support the MDAQMD's assertions regarding reliance interests. In *Regents,* while the Attorney General had determined that the work-authorization aspect of the DACA program was illegal following an adverse judicial decision about the DAPA program, the Attorney General's opinion was not comprehensive; *i.e.,* the Attorney General had "neither addressed the [deportation] forbearance policy at the heart of DACA nor compelled [the government] to abandon that policy." [95] Further, as the Supreme Court found, the government had offered "no reason for terminating forbearance." [96]

In contrast, the EPA, in disapproving Rule 1304(C)(2)(d), proposed and finalized a comprehensive, outcome-controlling legal determination that Rule 1304(C)(2)(d) fails to comply with federal law. *Regents* does not stand for the proposition that agencies must consider reliance interests when federal law compels the outcome. Also, unlike the situation in *Regents,* the EPA provided an opportunity for public comment and has provided reasoned responses to all comments received. Thus, EPA fulfilled its obligations under the APA.

Furthermore, the commenter's characterization of 1304(C)(2)(d) Offsets as "valuable" and as "purchased with costly reductions in actual emissions" is fundamentally a claim that sources hold compensable property rights in 1304(C)(2)(d) Offsets.[97] The EPA has repeatedly rejected similar assertions in the past and has never recognized a property right associated with emission

reductions to be used as offsets.[98] Also, it is unclear to what extent 1304(C)(2)(d) Offsets were, in fact, "purchased." In the MDAQMD, as in all nonattainment areas, construction of a new major stationary source requires the facility owner to obtain emission reduction credits to offset the emissions from the new construction. Nonattainment NSR permits issued by the MDAQMD to such sources are contingent on the surrender of credits to offset emissions up to the allowable limits in the permits. The EPA acknowledges that facility owners purchase emission reduction credits and surrender them to obtain permits with allowable emissions limits to allow them to proceed with construction. The MDAQMD, however, claims that its rules should additionally allow those same emission reduction credits, which facility owners have already surrendered to obtain allowable emissions limits that authorized the facility to emit up to those levels, to be re-used to offset emissions increases associated with future construction projects. This system is inconsistent with federal NNSR requirements in multiple respects and therefore further delegitimizes any claim that 1304(C)(2)(d) Offsets are a property right with a compensable value.

First, as explained our response to comment A.2.2, the EPA's regulations at 40 CFR 51.165(a)(3)(G) do not allow emission reduction credits to be re-used in subsequent permitting actions of, for example, facility modifications. The MDAQMD's rules allow emission reduction credits that have already been applied to initial construction of a new facility to be used to offset emissions increases in the future and are therefore inconsistent with NNSR requirements. Second, as also explained in our response to comment A.2.1, the EPA's regulations at 40 CFR 51.165(a)(3)(i)

allow the use of allowable emissions to be used as a baseline to calculate emission reductions that will be used as offsets only if demonstrations of RFP and attainment are also based on allowable emissions. MDAQMD's RFP and attainment demonstrations are based on actual emissions; therefore, MDAQMD's calculation of reductions to be used as offsets must also be based on actual emissions. Third, since 2002, the EPA's regulations have clearly specified that emissions increases resulting from major modifications must be offset through a calculation that uses actual emissions before the modification. In fact, as explained above in our response to comment A.3.1, as part of the 2002 NSR Reform Rule, the EPA explicitly rejected a calculation that would use potential emissions as a baseline in this calculation. MDAQMD's provision for 1304(C)(2)(d) Offsets clearly allow sources to offset emissions increases through reductions in allowable emissions and therefore fail to ensure compliance with the requirement that sources offset emissions increases through reductions in actual emissions. The fact that 1304(C)(2)(d) Offsets are inconsistent with federal law invalidates any claim of property right or compensable value.

*Comment A.4.2:* Commenter 05 states that the removal of Rule 1304(C)(2)(d) would "create a discriminatory situation, where a facility that has previously provided offsets for emission sources/processes is not differentiated from one that has received a permit without providing offsets."

*Response to Comment A.4.2:* As explained in the response to comment A.4.1, Rule 1304(C)(2)(d) Offsets do not comply with CAA 173 and federal NNSR requirements for offsetting emissions increases at major stationary sources. The permit application process should be sufficient to enable the reviewing authority to determine the quantity and status of offset credits and reductions; diligent implementation of the federal requirements will avoid confusion and unfair outcomes. Rule 1304(C)(2)(d) Offsets are not valid under the CAA or the federal NNSR regulations. The FIP will bring the MDAQMD's offset regulations into compliance with the CAA and federal regulations. The EPA disagrees that the removal of Rule 1304(C)(2)(d) would create a discriminatory situation.

*Comment A.4.3:* Commenter 08 states that MDAQMD Rule 1304(C)(2)(d) has developed a provision for major facilities to utilize existing allowable emissions as a mechanism to generate simultaneous emissions reductions during another permitting action and

---

[92] Id. at 33.

[93] Id. at 2.

[94] Id. at 35.

[95] Id. at 28.

[96] Id.

[97] MDAQMD has made similar assertions in the past. See, *e.g.,* MDAQMD Regulation XIII Final Staff Report, March 22, 2021, page 44, footnote 188: "If the amount of offsets needed is calculated using the HAE of the emissions unit(s) involved many Facilities view this as a taking of property (namely the previously allowed PTE that was fully offset) without just compensation."

[98] See, *e.g.,* Letter from John S. Seitz, Director, EPA Office of Air Quality Planning and Standards to Peter F. Hess, President, California Air Pollution Control Officers Association Joint Commission of Regulators & Business, July 8, 1996 ("Finally, your letter states that it is unfair for owners of banked ERC's not to be able to sell or use them. However, please note that although ERCs are a limited authorization to emit, they are not and never have been an absolute property right."); EPA, Office of Air and Radiation, "Improving Air Quality with Economic Incentive Programs," January 2001, p. 80 ("Emission reductions and emission allowances generated, traded, and used in emission trading EIPs do not have property rights associated with them. They simply represent a limited authorization to emit for the entity holding the tradable reduction or allowance."); see also South Coast Air Quality Management District (SCAQMD) Rule 2007, "Trading Requirements," most recently approved into the California SIP at 73 FR 38122 (July 3, 2008), which states, in relevant part, at subsection (b)(3) that a RECLAIM Trading Credit "shall not constitute a security or other form of property . . ."

that this provision has been in effect since the 1990s. Commenter 08 urges the EPA to consider how the sudden change of a provision in effect for years will impact regulated facilities.

*Response to Comment A.4.3:* As explained above in the responses to comments A.2.1 and A.2.2, the MDAQMD's Rule 1304(C)(2)(d) is not consistent with the CAA or the EPA's NNSR regulations. The EPA disagrees with the commenter's suggestion that the FIP represents a "sudden change," because the calculation method in Rule 1304(C)(2)(d) was specifically prohibited in the EPA's 2002 NSR Reform rule, which included 40 CFR 51.165(a)(3)(ii)(J).[99] Moreover, the MDAQMD and regulated entities in its jurisdiction have been aware of the EPA's position regarding Rule 1304(C)(2)(d) and the MDAQMD's practices regarding its emissions offset calculations since at least March 2021, when the MDAQMD responded to the EPA's concerns about Rule 1304(C)(2)(d) in the "Appendix G to Staff Report" document (an appendix to its 2021 final staff report and rules that the MDAQMD adopted), which is a public document. In December 2019, prior to the release of that document, the EPA wrote to the MDAQMD to inform the MDAQMD of its concern regarding the offset calculation method allowed under what is currently Rule 1304(C)(2)(d).[100] The EPA, the District, and CARB then committed significant resources to meeting, on a bi-weekly basis from approximately March 2020 to June 2021, for detailed discussions to address the deficiencies in the MDAQMD's NSR program. The EPA's obligation to promulgate a FIP is a consequence of a finding of failure to submit published in the **Federal Register** in February 2017; the subject of a lawsuit filed in the U.S. District Court for the Northern District of California in June 2022; and a court-ordered obligation as the result of a consent decree that was subject to a 30-day comment period as announced in the **Federal Register** on April 5, 2023.

Finally, the EPA notes that the FIP will apply prospectively, that is, to new major stationary sources and major modifications at existing major sources that commence construction after the effective date of the FIP.

### 5. Comments on Potential Impacts and Implementation of the FIP

*Comment A.5.1:* Commenter 01 states that the proposed FIP is arbitrary and capricious because the EPA fails to consider important aspects of the problem before the Agency, including the impacts of the proposed FIP on air quality. The commenter states that the EPA fails to substantiate its claim that the proposed FIP will result in greater emission reductions. The commenter states that this claim is false because Rule 1304(C)(2)(d) Offsets incentivize operators to voluntarily lower actual emissions to ensure the greatest volume of creditable emissions reductions for future projects. The commenter states that the EPA's disapproval of offset calculations allowed under Rule 1304(C)(2)(d) encourages source operators to retain older, dirty units and to replace those old and dirty units with comparably dirty units when the units fail. The commenter states that, under the proposed FIP, operators are particularly incentivized to run equipment to produce the maximum amount of emissions for the two years prior to applying for a modification to secure creditable emissions reductions.

Similarly, commenters 07, 08, and 09 state that MDAQMD Rule 1304(C)(2)(d) enables permit holders to plan for equipment upgrades and modernizations that will ultimately reduce actual major source emissions in the ozone nonattainment area. These commenters state that removal of these offset provisions will hinder emission reduction projects and burden facilities with significant increased costs. Commenter 05 adds that the loss of previous offsets would create a disincentive for facilities to be upgraded to new technology. Commenter 09 states that regulated facilities may elect to cancel business expansions, facility improvements, or other major capital investments that would modernize equipment or otherwise benefit air quality.

*Response to Comment A.5.1:* The EPA disagrees with the comments. Preliminarily, we note that the commenters do not provide any analysis or support for their assertions that Rule 1304(C)(2)(d)'s approach to calculating offsets results in greater emission reductions than the federal requirements for offsets. We also note that in the 2002 NSR Reform Rule, we rejected an option similar to Rule 1304(C)(2)(d) that would have allowed sources "to generate netting credits and ERCs for offsets based on potential hourly emissions, even if never actually emitted," because we had determined

that such an approach "could sanction greater actual emission increases to the environment, often from older facilities, without any preconstruction review."[101] In the 1996 NSR proposal, the EPA stated that its analysis of actual and allowable emissions in two states showed that "typical source operation frequently does result in actual emissions that are substantially below allowable emissions levels."[102] In other words, the difference between actual and potential emissions may be up to 70 percent, depending on source category and pollutant.[103] Using actual emissions as a baseline to calculate emissions will reflect emissions increases and require offsets that would not be captured or regulated if allowable emissions were used as a baseline. As the EPA also stated in response to comments in the rulemaking for the 2002 NSR Reform Rule, "The use of potential emissions for offset credits is in direct conflict with the Act. Under section 172(c) of the Clean Air Act, emissions offsets must be based on reductions in actual emissions. Allowing sources to get credit for reductions in potential emissions would result in 'paper' credits, and could allow sources to receive credit for reducing emissions that never actually occurred."[104] Similarly, the MDAQMD Rule 1304(C)(2)(d) would allow sources to receive credit for "reductions" in emissions that do not actually occur and use them to offset actual emissions increases.

Moreover, we note that the federal regulations, such as 40 CFR 51.165(a)(3)(ii)(J) and 40 CFR 51.165(a)(3)(ii)(G), are more protective than Rule 1304(C)(2)(d). For example, 40 CFR 51.165(a)(3)(ii)(J) requires facilities to offset the difference between pre-project actual emissions and post-project allowable emissions that are associated with *each* major modification, and 40 CFR 51.165(a)(3)(ii)(G) requires those actual emissions reductions to be reductions that the facility has not relied upon in a prior permitting action.

The EPA also disagrees with comments claiming that the EPA's disapproval of Rule 1304(C)(2)(d) will encourage retention of older greater-emitting units and incentivize sources

---

[99] Rule 1304(C)(2)(d) is also inconsistent with the federal regulations promulgated in 1980.

[100] Memorandum, Lisa Beckham, EPA Region IX, to Brad Poiriez, MDAQMD, "Re: Mojave Desert Air Quality Management District New Source Review Program," December 19, 2019. A copy of the letter is available in the docket for this rulemaking action.

[101] 67 FR 80186, 80205.

[102] 61 FR 38250, 38270.

[103] Id.

[104] U.S. EPA Office of Air Quality Planning and Standards, Technical Support Document for the Prevention of Significant Deterioration and Nonattainment Area New Source Review Regulations (November 2002) at page 1–6–11, available at *https://www.epa.gov/sites/default/files/2015-12/documents/nsr-tsd_11-22-02.pdf*.

to operate and emit more. Rather, the FIP encourages sources to take enforceable limits that reflect the source's actual emissions. We note in addition that the CAA does not require sources to offset emissions that they do not emit or intend to emit. Regarding commenters' concern that the FIP would discourage emissions-reduction projects, we note that a project that reduces actual emissions would not be subject to NSR requirements to offset and install pollution controls. Installation of cleaner equipment is therefore not in jeopardy under the FIP. Only projects at major stationary sources that would increase emissions will be required to undergo review to determine if emissions increases will trigger requirements to install emissions controls and to offset emissions increases. It is therefore unclear how sources would be incentivized to retain older, dirtier equipment if the installation of newer, cleaner equipment would result in emissions decreases.

Finally, we disagree that Commenter 01's quotations from the 2002 NSR Reform Rule support its claims that Rule 1304(C)(2)(d) Offsets "incentivize operators to voluntarily lower actual emissions to ensure the greatest volume of creditable emissions reductions for future projects." The statements quoted by Commenter 01 are irrelevant to this action, because they do not involve offsets.

*Comment A.5.2:* Commenter 01 states that the EPA fails to address the practical impacts the proposed FIP will have on facilities. More specifically, the commenter states that it is unclear what a new minor facility, existing minor facility remaining under the applicability threshold, or a synthetic minor facility retaining its permitted limitation on PTE would need to submit to the EPA to show that it is not subject to the FIP requirements. The commenter requests that the EPA clarify whether all new or modified facilities would need to submit applications to the EPA and that it appears every permit application would be required to be duplicated in EPA Region 9's electronic permit application system to ensure that a minor facility has not become subject to the FIP. The commenter also states that while the MDAQMD has the staffing and expertise to properly analyze and process applications under the current SIP, it has neither the time nor the resources to devote to analyzing each application for FIP applicability purposes.

*Response to Comment A.5.2:* As explained in the EPA's proposed action, the FIP will apply "(i) If you propose to construct a new major stationary source

and your source is a major source of nonattainment pollutant(s)" or "(ii) If you own or operate a major stationary source and propose to construct a major modification, where your source is a major source of nonattainment pollutant(s) and the proposed modification is a major modification for the nonattainment pollutant." [105] The relevant terms in the quoted provisions are defined in the definitions section of the FIP, in section 40 CFR 52.285(b). If the applicant believes that its proposed project would constitute a new major source or a major modification under the FIP, it is required to submit an application to the EPA or the designated reviewing authority (if not the EPA) to obtain a permit under the FIP. It is the permit applicant's responsibility to comply with the FIP provisions. Failure to obtain a permit in accordance with the FIP prior to construction and operation of the new or modified source would be a federally enforceable violation of the FIP and the CAA. Under the FIP, existing minor facilities remaining under the applicability threshold and synthetic minor facilities retaining the permitted limitation on PTE would not need to apply for a permit under the FIP unless they make a modification that would constitute a major stationary source by itself. [106]

Regarding Commenter 01's concern over the MDAQMD's time and resources to devote to analyzing applications, the EPA would be responsible for implementation of the FIP unless and until the MDAQMD is delegated authority to implement it. The MDAQMD would only be delegated authority to implement the proposed FIP if it requested delegation. Under the FIP as implemented by the EPA, applicants would need to submit their applications to the EPA, not to the MDAQMD.

*Comment A.5.3:* Commenter 04 states that this action is crucial for ensuring that regions with air pollutant concentrations above the NAAQS are protected from further environmental degradation. This commenter presents information on the detrimental impact of air pollution to health and notes that these effects are felt mainly by minority communities, such as low-income families or people of color, who are more likely to live in areas with higher pollution levels. The commenter supports approval of the FIP and states that the FIP will provide a necessary regulatory framework to manage and reduce emissions, enhancing efforts to

meet and maintain NAAQS in the region.

*Response to Comment A.5.3:* The EPA has noted the commenter's support of this action.

*Comment A.5.4:* Commenters 01, 05, 06, 07, and 08 express concern about the permit processing timeline under the proposed FIP. Commenter 01 states that pursuant to these timelines, approximately 90 percent of permit applications submitted to the MDAQMD are processed and issued within 90 days but that no similar timelines are proposed in the FIP and that this may result in a detrimental impact to sources, especially minor facilities, to the extent they cannot proceed with their modifications due to the necessity of awaiting an EPA determination. Commenter 05 states that the FIP creates the potential for delays in permit issuances due to conflicts between California law and the FIP on items such as the completeness determination, BACT determinations, and offsetting and the use of SERs, and Commenter 06 adds that the differences between the requirements under the SIP and the FIP will add a level of complexity to the permit application process and in ensuring facilities comply with the permits. Commenters 05 and 06 state that potential timing issues would have an adverse impact on the national security mission at Department of Defense facilities because a facility cannot proceed with construction until it receives two permits—one from MDAQMD, and one from EPA. Commenters 01, 07, and 08 request that the EPA provide timeline estimates for the proposed permit processing.

*Response to Comment A.5.4:* Neither the CAA nor the existing NNSR FIP that applies in tribal areas, which is very similar to the FIP, includes a requirement for the reviewing authority to render a decision on a permit application within a certain period of time. Likewise, the EPA has not incorporated any temporal requirement to the issuance of permits under this FIP. Under the CAA, the EPA is required to make a permit decision on a Prevention of Significant Deterioration (PSD) permit application within one year after the application is determined complete by the EPA. [107] While no analogous provision exists in Part D of Title I of the CAA, which governs Plan Requirements for Nonattainment Areas, the EPA will endeavor to follow the PSD permit application processing timeline when we review applications submitted under the finalized FIP. Also, should the MDAQMD receive delegation as a

---

[105] 89 FR 56237, 56247; 40 CFR 52.285(c)(1)(i)–(ii) (as proposed).

[106] Appendix S, section II.A.4(i)(c).

[107] CAA section 165(c) (42 U.S.C. 7465(c)).

reviewing authority of the FIP, it could consolidate its review under the FIP with its review under the SIP.

Finally, it is not clear how applicants for minor source permits—either new or modified sources—would be affected by the timing issue because the proposed FIP does not affect minor NSR.[108]

*Comment A.5.5:* Commenter 01 states that the proposed FIP includes ''de minimis'' provisions that allow emissions increases of less than 25 tons per year aggregated with all other net increases from the facility over five consecutive calendar years to not require BACT or offsets. Commenter 01 states further that this provision is contrary to California law, which requires any emission unit that emits or has the potential to emit over 25 lbs per day to be equipped with BACT. The commenter also states that the Protect California Air Act of 2003 prohibits California air districts, including the MDAQMD, from ''backing off'' their NNSR programs to allow the implementation of requirements less stringent than those in place as of December 30, 2002. The commenter states that because the MDAQMD's current SIP rules have been in place since before 1996, they cannot now be avoided, and that the FIP creates the potential for massive confusion and misunderstanding among regulated facilities that are located in the MDAQMD.

*Response to Comment A.5.5:* If the MDAQMD believes that the provisions in its current SIP, which EPA acted upon in the 2023 LA/LD,[109] will result in greater emissions reductions than the application of the de minimis provisions proposed in the FIP, there should be no conflict between the FIP and the MDAQMD's SIP. The EPA is not required to apply state-level requirements even if, in some cases, the application of the state-level requirements would result in a scenario where emissions reductions would be greater than under federal requirements. Likewise, in the situation described in the comment, a permit applicant's compliance with a more stringent MDAQMD requirement would enable the applicant to satisfy the federal requirement. The de minimis requirement that the commenter references, which is in CAA section 182(c)(6), states that a source cannot be considered ''de minimis'' for NNSR applicability purposes unless its net emissions increases over the past five consecutive calendar years are less than

25 tons per year.[110] It is not clear how the federal requirement is ''directly contrary'' to the California law that, according to the commenter, ''requir[es] any emissions unit which emits or has the potential to emit over 25 LBS per day to be equipped with BACT;'' the California requirement sets a threshold for BACT, based on potential emissions of 25 pounds per day, whereas the federal requirement says that the source must undergo NNSR (*e.g.,* satisfy BACT and offsets requirements) if net emissions increases over the last five consecutive calendar years exceed 25 tons per year. It would appear that in most, if not all, cases a source's compliance with the California requirement would also comply with the federal requirement.

Finally, the EPA finds this comment from the MDAQMD confusing given that the MDAQMD stated elsewhere in its comments that its August 7 SIP submittal addresses all but one of the deficiencies EPA identified in the 2023 LA/LD, which the EPA understands to be a reference to Rule 1304(C)(2)(d).[111] The EPA's 2023 LA/LD rulemaking also found the MDAQMD's rules as adopted in 2021 to be deficient because they did not ensure compliance with CAA 182(c)(6). Based on discussions with the MDAQMD after we finalized the 2023 LA/LD, we had understood that the MDAQMD intended that its revised rules as adopted on March 25, 2024, and submitted to the EPA on August 7, 2024, would address the concerns identified in our LA/LD, including adding the missing de minimis provision. While our full review of those rules will be attentive to this issue, it is not clear why the MDAQMD would object to the inclusion of the de minimis provision in the FIP.

*Comment A.5.6:* Commenters 05, 06, 07, 08 and 09 state that permit holders may also face increased permit fees, increased permit processing times, and possible inconsistencies between the duplicate EPA permits and district permits. The commenters state that dual permits and their separate requirements will increase the complexity and potential for conflicting or unclear requirements and that this may lead to unintended compliance issues and

conflicts, which could compromise a source's ability to comply as well as result in significant penalties. Commenters 05, 07, and 08 request that the EPA work with the MDAQMD to develop a solution that would remove the requirement that sources obtain two permits.

Commenter 05 requests that the EPA confirm which agency (the MDAQMD or the EPA) will be the permitting authority under the proposed FIP rule or if the intention is for both the MDAQMD and the EPA to issue and enforce separate permits independently, including facility inspections and processing fees.

*Response to Comment A.5.6:* Unless the MDAQMD requests, and the EPA approves, delegation to implement the FIP or the MDAQMD addresses the deficiency in MDAQMD Rule 1304(C)(2)(d), major stationary sources and sources undergoing major modifications in areas within the jurisdiction of MDAQMD will need to obtain two permits—one under the EPA's FIP, and one under the MDAQMD's SIP. The MDAQMD, if delegated to implement the FIP, could consolidate its review under the FIP and its review under its SIP-approved NNSR program. The EPA considered options to avoid permit applicants having to obtain two permits, such as delegating the FIP to MDAQMD. However, the MDAQMD is not interested in implementing the FIP at this time. We also considered regulatory approaches that would reduce or eliminate the MDAQMD's role in issuing permits to major stationary sources, but those options seemed likely to have unnecessarily disruptive outcomes and uncertain impacts on permitting for minor sources. We anticipate that applications for projects subject to the FIP will require essentially the same information as applications to be submitted to the MDAQMD, which should reduce the permitting burden on permit applicants. We also anticipate that the most significant difference between the two permit programs will be evaluation of offset obligations and requirements. We also hope that the MDAQMD's newly submitted NNSR rules will narrow the scope of the FIP once we have approved these rules into the SIP, reducing EPA's role in permitting major stationary sources within MDAQMD's jurisdiction.

In response to Commenter 05's inquiry regarding which agency will be the permitting authority, both the EPA and MDAQMD will be permitting authorities for major stationary sources. As explained previously, major sources subject to the FIP will need to obtain

---

[108] See 40 CFR 52.285(c)(1)(i)–(ii); 89 FR 56237, 56247.

[109] 88 FR 42258 (June 30, 2023).

[110] The de minimis requirement at CAA section 182(c)(6) was a part of the 1990 CAA Amendments.

[111] MDAQMD August 8, 2024 comment letter: ''USEPA and MDAQMD reached resolution of all but one of the purported deficiencies and the MDAQMD thereafter modified its NNSR rules on 3/25/2024.'' In the comments Brad Poiriez, on behalf of the MDAQMD, provided during the July 24, 2024 public hearing, Mr. Poiriez mentioned the ''pending SIP submission containing revisions to the NNSR rules that were agreed upon by the District and US EPA.'' (Transcript page 16).

two permits—one under the EPA's FIP and one under the MDAQMD's SIP.

*Comment A.5.7:* Commenters 07 and 09 state that the proposed FIP will likely cause increased demand and prices for ERCs of nonattainment area pollutants. The commenters state that the proposed FIP may have significant impacts on local ERC demand and prices for emission offsets at a time where there are a few private holders of ERCs with relatively low quantities of available credits within the MDAQMD. Commenter 09 provides examples of the prices of credits for $PM_{10}$ and Nitrogen Oxides ($NO_X$) in the South Coast Air Quality Management District to support its assertion that it is unclear how the FIP will address such potentially restrictive and unsustainable ERC market conditions within the MDAQMD. Commenter 09 states that there has been insufficient study of these potential ERC market conditions, additional emission offset costs, and related concerns on regulated facilities.

Commenter 04 recommends that the EPA work with the MDAQMD to ensure that the proposed FIP complements existing state and local efforts and states that coordination will help avoid any errors in the process. This commenter states that the NNSR rules should provide flexibility to accommodate the needs of businesses and economic development in the region.

*Response to Comment A.5.7:* The EPA is promulgating this FIP as required by a consent decree because the MDAQMD does not have a fully approved NNSR SIP, as required by the 2008 ozone NAAQS implementation rule.[112] The requirements that entities would be subject to under the FIP, which implements Appendix S, are the same requirements that regulated entities in other jurisdictions across the country are currently subject to and have been subject to for decades under SIP-approved programs that meet the minimum requirements of the CAA. The EPA recognizes the scarcity of offsets in the nonattainment area that would be covered by this FIP. The EPA will continue to work with the MDAQMD to assist in identifying offsets from sources in the nonattainment area that will be covered by this FIP.

*Comment A.5.8:* Commenter 08 states that the proposed FIP puts the time, monetary, and compliance burdens on facilities. Similarly, Commenter 09 states that the burdensome conditions that the FIP will cause will make it difficult for it and other regulated

facilities to make capital investments, equipment purchases, facility expansions, new employee hires, and other business decisions.

*Response to Comment A.5.8:* The EPA disagrees with the commenters' characterizations of the impacts of the FIP. Facilities in the MDAQMD are required to comply with federal NNSR requirements, including the requirements for offset quantification and generation, in the same manner as any other facilities in other jurisdictions that are located in areas not attaining the NAAQS. The FIP applies only when new or existing major stationary sources undertake facility modifications that will increase emissions above the applicable thresholds. The FIP is necessary to ensure that air quality in the MDAQMD, which is currently classified as Severe nonattainment for the 2008 and 2015 ozone NAAQS, as well as Moderate nonattainment for the $PM_{10}$ NAAQS, improves toward attainment of the NAAQS over time. At present, the MDAQMD's current rules allow for applicants to be excused from certain NNSR requirements, as described in the proposed FIP rulemaking and in the 2023 LA/LD.[113]

## B. Summaries of Oral Comments Received During the Public Hearing and EPA's Responses

### 1. Comments on the Timing and Implementation of the FIP

*Comment B.1.1:* Commenter AA states that while he understands that the EPA is under a consent decree to act on the MDAQMD's NNSR provisions, the EPA's promulgation of a FIP seems to be rushed given the pending SIP submission that contains revisions to the NNSR rules that the MDAQMD, and the EPA agreed to during mediation following the MDAQMD's petition for review of the EPA's 2023 LA/LD action.[114] The commenter states that EPA was copied on the submission of the MDAQMD's rules to CARB and thus has constructive notice of the MDAQMD's submission.

Commenter AA states that, to the extent that the EPA's rush to promulgate the FIP is spurred by the dispute between the MDAQMD the EPA over the use of fully offset allowable emissions as SERs at an existing major facility, the EPA should reconsider its disapproval of the MDAQMD's SER provision. The commenter states that the EPA has previously approved the MDAQMD's offset provision and that there is a reasonable reliance by

industry and the MDAQMD on this approval.

*Response to Comment B.1.1:* The EPA disagrees with the commenter's characterization that "the EPA's promulgation of a FIP seems to be rushed." In fact, the EPA's obligation to promulgate a FIP is more than five years overdue. As explained in our proposed rulemaking, on February 3, 2017, the EPA found that the State of California failed to submit a SIP revision for NNSR rules that apply to a Severe classification for the 2008 ozone NAAQS, as required under subpart 2 of part D of title 1 of the CAA and the 2008 Ozone SIP Requirements Rule.[115] In addition to establishing deadlines for the imposition of sanctions, the EPA's finding of failure to submit triggered an obligation under CAA section 110(c) for the EPA to promulgate a FIP no later than two years from the finding, *i.e.,* by March 6, 2019.[116] The EPA did not meet this deadline and was subsequently sued over its failure to do so.[117] The lawsuit was resolved by a consent decree that underwent a 30-day public comment period before it was entered by the court on June 15, 2023. Under the terms of the consent decree, no later than November 29, 2024, the EPA must sign a notice of final rulemaking to approve a revised SIP submission, promulgate a FIP, or approve in part a revised SIP submission and promulgate a partial FIP for the Severe NNSR SIP element. On November 8, 2024, the EPA and CBD agreed to extend the deadline to January 10, 2025.[118]

As the commenter notes, MDAQMD adopted revised rules on March 25, 2024, and submitted them to CARB for transmittal to the EPA. On August 7, 2024, CARB submitted the revised rules to the EPA. The EPA is currently reviewing the submission as required under section 110(k) of the CAA. The EPA has confirmed that the submission still contains the deficiency associated with MDAQMD Rule 1304(C)(2)(d) that EPA has previously identified. For the EPA to discharge its obligation to promulgate a FIP, it would need to fully approve the MDAQMD's NNSR

---

[112] *Center for Biological Diversity et al.,* v. *Regan,* No. 3:22–cv–03309–RS (N.D. Cal.). This consent decree is also available in the docket for this action.

[113] 88 FR 42258, 42260; 89 FR 56237, 56240.

[114] 88 FR 42258.

[115] 82 FR 9158 (February 3, 2017).

[116] Id.

[117] *Center for Biological Diversity et al.,* v. *Regan,* No. 3:22–cv–03309–RS (N.D. Cal.). The consent decree, as entered by the court on June 15, 2023, is available in the docket for this action.

[118] Id. Prior to court's entry of the 2023 CBD Consent Decree, the EPA published a notice in the **Federal Register** announcing the proposed settlement and providing an opportunity for interested persons to submit comments. 88 FR 20166 (April 5, 2023). The EPA received no comments on the proposed settlement. The parties' joint stipulation to extend the consent decree deadline is available in the docket for this action.

submission, which is not possible due to the deficiency associated with MDAQMD Rule 1304(C)(2)(d). The EPA provides additional information that is relevant to this comment both specifically in our response to Comment A.1.1 in this Response to Comments and generally in our responses to the comments summarized in section A.1 of this Response to Comments, where we address the written comments we received that pertain to the EPA's obligation under the applicable consent decree.

As stated in Section III.H of the proposed rulemaking action, if the EPA approves CARB's recent SIP submittal, the approved MDAQMD rules would apply rather than the FIP, except for the portion of the FIP that had not been replaced by the approved SIP.[119]

Lastly, for the reasons we explain in our responses to comments A.4.1 through A.4.3 in this Response to Comments, we disagree with Commenter AA's assertion that the EPA should reconsider the FIP because of industry's reliance upon MDAQMD's Rule 1304(C)(2)(d).

*Comment B.1.2:* Commenter BB states that the EPA should postpone promulgating the FIP until after the EPA and the MDAQMD resolve their differences. Commenter BB states that there is only one pending issue that the two agencies need to resolve. Having to apply to two jurisdictions for permits will cause an undue burden to facilities like the one at which Commenter BB works.

*Response to Comment B.1.2:* It is not possible for the EPA to postpone finalizing the FIP while we attempt to resolve our differences with the MDAQMD. Section 110(c) of the CAA requires the EPA to promulgate a FIP for a deficient NNSR program. As the EPA wrote in the proposed action, the purpose of this NNSR FIP, which will regulate sources within the MDAQMD's jurisdiction, is to fulfill the EPA's statutory duty by the deadline established under a consent decree in a lawsuit brought against the EPA.[120] The consent decree compels the EPA to promulgate a FIP by November 29, 2024, unless the EPA can fully approve the MDAQMD's NNSR SIP program before that date.[121] On November 8, 2024, the EPA and CBD agreed to extend the deadline to January 10, 2025.[122] We

provide additional information on this issue in our responses to comments A.1.2 and A.1.3 in this Notice.

Regarding the burdens associated with compliance with the FIP and the MDAQMD's NNSR program, we direct the reader to our response to written comment A.5.6, where we respond to similar assertions from other commenters. Unless the EPA delegates authority to implement the FIP to the MDAQMD, permit applicants will need to apply to the EPA for an NNSR permit under the FIP and to the MDAQMD for a permit under the SIP. If, however, the MDAQMD requests delegation authority to implement the FIP, the EPA is willing to work with the MDAQMD for MDAQMD to obtain this delegation authority.

**2. Comments on the 2023 LA/LD of the MDAQMD's NNSR SIP Submission**

*Comment B.2.1:* Commenter AA states that the EPA previously approved the use of SERs, as offsets, which it subsequently disapproved in the 2023 LA/LD action. The commenter states that neither the 2023 LA/LD action nor the proposed FIP fully explain the EPA's policy reversal of MDAQMD Rule 1304(C)(2)(d), which regulates the use of SERs. The commenter states that allowable emissions reflected in a permit were backed by real reductions when the permit was issued and that the EPA has not explained why these reductions are no longer real, especially when the SERs are surplus adjusted and adjusted for Reasonably Available Control Technology (RACT) upon use. The commenter states that any leftover SERs created in the permitting action would never again be available for use, since SERs cannot be put into the ERC bank. Finally, the commenter states that CAA section 173(c)(2) expressly mandates that these SERs are creditable emission reductions (*i.e.,* offsets), that EPA recognized this in 1996, and that there has been no relevant change in the CAA or the implementing regulations since then.

*Response to Comment B.2.1:* Rule 1304(C)(2)(d) is not approvable under the CAA or the requirements for NNSR SIPs at 40 CFR 51.160–51.165. As we explain in our responses to comments A.2.1 and A.2.2, MDAQMD Rule 1304(C)(2)(d) is not consistent with section 173(c)(1) of the CAA, and it is not consistent with the requirements at 40 CFR 51.165(a)(3)(i), 40 CFR

51.165(a)(3)(ii)(G), or 40 CFR 51.165(a)(3)(ii)(J) because it allows facilities in the MDAQMD's jurisdiction to use reductions in past potential emissions, even if actual emissions associated with a modification would not be reduced at all, to offset emissions increases from construction of modified emissions units. This arrangement creates a loophole in the actual emissions accounting system established by the CAA and in place in the MDAQMD, which uses an attainment plan that is based on actual emissions.[123] The currency of the CAA is *actual emissions,* and that is true at *each* major modification undertaken at a facility.

As we explained in our response to comment A.2.1 in this rulemaking, Rule 1304(C)(2)(d) is inconsistent with CAA section 173(c)(1), 40 CFR 51.165(a)(3)(i), 40 CFR 51.165(a)(3)(ii)(G), and 40 CFR 51.165(a)(3)(ii)(J) because it allows a facility to offset emissions from a major modification with previously-relied upon offsets associated with a prior, distinct, project. Now, because Rule 1304(C)(2)(d) is at odds with these requirements, it is not approvable.

**3. Comments on the Impact of the FIP on Reliance Interests**

*Comment B.3.1:* Commenter AA is concerned that the EPA, in proposing the FIP, failed to recognize and assess the impact of the FIP on the MDAQMD and regulated industry. The commenter states that the MDAQMD and sources subject to the FIP have a reliance interest in the MDAQMD's Rule 1304(C)(2)(d) because, for over 25 years, the MDAQMD and its constituents have operated under the EPA's previously approved Rule 1304(C)(2)(d) procedures. The commenter states that SERs allowed under Rule 1304(C)(2)(d) may not be allowed under the FIP, and that this will impede the permitting process and the timeline for projects that have proceeded based on the understanding that MDAQMD's Rule 1304(C)(2)(d) was acceptable. Now, the commenter states, the EPA is reversing its position to eliminate these SERs without explanation or consideration of readily apparent alternative measures that could reduce the severity of its impact. The commenter states that the EPA's action does not reflect the

---

[119] 89 FR 56237, 56243.

[120] Id. at 56240–56241.

[121] *Center for Biological Diversity et al.,* v. *Regan,* No. 3:22–cv–03309–RS (N.D. Cal.). This consent decree is also available in the docket for this action.

[122] Id. Prior to court's entry of the 2023 CBD Consent Decree, the EPA published a notice in the **Federal Register** announcing the proposed

settlement and providing an opportunity for interested persons to submit comments. 88 FR 20166 (April 5, 2023). The EPA received no comments on the proposed settlement. The parties' joint stipulation to extend the consent decree deadline is available in the docket for this action.

[123] MDAQMD's 2008 and 2015 ozone NAAQS attainment plans are based on actual emissions. The 2008 ozone NAAQS plan is available at: *https:// ww2.arb.ca.gov/sites/default/files/classic/planning/ sip/planarea/wmdaqmp/2016sip_mdplan.pdf,* pp. 7, 34 (EPA approved this plan, see 86 FR 53223 (September 27, 2021).) The 2015 ozone NAAQS is available at: *https://www.mdaqmd.ca.gov/home/ showpublisheddocument/9589/ 638084392297570000,* pp. 4–5, 24, 80.

cooperation between agencies that should be strived for, nor is it in compliance with the EPA's obligations under the APA.

*Response to Comment B.3.1:* As explained in our response to comment A.4.1, the EPA disagrees with the commenter's assertion regarding reliance interests. The EPA must promulgate a FIP because the MDAQMD has not adopted NSR rules that the EPA can fully approve.

Furthermore, it is not clear what the commenter means by the statement that EPA's proposed FIP fails to comply with EPA's obligations under the Administrative Procedure Act. To the extent that this comment is the same as comment A.3.1, the EPA's response is already stated in our response to that comment.

4. Comments on Other Potential Impacts of the FIP

*Comment B.4.1:* Commenter AA states that the proposed FIP is primarily silent about practical implementation issues, elaborating that the only discussion on that topic seems to be that two permits will be necessary and that the new permit for modified major facilities will need to use the EPA Region IX's electronic format.

*Response to Comment B.4.1:* Section 40 CFR 52.285(d)(3) of the FIP identifies the information that an applicant must provide to the EPA (or other reviewing authority, if delegated by the EPA) when submitting an application under the FIP.

*Comment B.4.2:* Commenter AA states that the EPA has expressed orally to the MDAQMD on a number of different occasions that it is concerned about various minor sources that will somehow escape NNSR. The commenter states that the EPA has especially expressed this concern for synthetic minor sources, where a permit limitation is the only thing rendering the facility "minor." The commenter states that, given the EPA's concern, it seems to be a bit of an oversight that specific provisions regarding review of minor sources are not addressed either directly or by reference.

*Response to Comment B.4.2:* The FIP and 40 CFR 51.165 generally apply to major stationary sources of air pollution, though synthetic minor sources must comply with definitions of "potential to emit" and provisions relating to the relaxation of these limits. At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation that was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a

pollutant, such as a restriction on hours of operation, then the requirements of the FIP shall apply to the source or modification as though construction had not yet commenced on the source or modification.[124] The FIP also requires sources to identify any emission limitations taken by the source.[125] The FIP incorporates the definitions used in Appendix S to Part 51, including the definition of "Potential to Emit."[126] Synthetic minor sources that take a limit on their PTE are required to comply with this definition and the provisions relating to the relaxation of limits.

*Comment B.4.3:* Commenter BB states that, in contrast to the MDAQMD's requirement for a response or issuance of permits within 90 days of application, the EPA's permitting process lacks a specific timeline. The commenter states that this potential delay could significantly impact manufacturing facilities applying for permits, which could impact facility operation and planning. The commenter states that facilities want to comply, but adding layers to the already-approved SIP that is implemented by the MDAQMD will cause an added layer of undue burden on the facility.

*Response to Comment B.4.3:* We refer the reader to our response to comment A.5.4 for this comment.

*Comment B.4.4:* Commenter CC states that five out of the six issues the EPA identified in the 2023 LA/LD of the MDAQMD's NNSR program have apparently been resolved and that after CARB takes its action only one issue remains. The commenter states that it appears that issue is more based on interpretation, which does not seem resolvable by a FIP as far as the implications and impacts it will have on industry for submitting dual permits, having different permitting timelines, additional costs, and impacts on projects moving forward that maybe benefit clean air. The commenter suggests not implementing the FIP and instead encourages that it would be more beneficial for the EPA and the MDAQMD to work through their issues.

*Response to Comment B.4.4:* The EPA directs the reader to our responses to comments A.1.3, A.5.6, and A.5.8. The EPA received CARB's submission of the MDAQMD's most recent NNSR SIP on August 7, 2024. The EPA is currently reviewing the submittal. Because the MDAQMD did not address one of the deficiencies that the EPA identified in

the 2023 LA/LD, even if it did address all of the other deficiencies, the EPA would still need to promulgate a FIP by January 10, 2025, as required under the consent decree, because the EPA would still not be able to fully approve the MDAQMD's NNSR program into the SIP.[127]

To the extent that the disagreement between the EPA and the MDAQMD is based upon interpretation of legal requirements, the FIP is a gap-filling tool that the EPA is required to promulgate when states or air districts do not implement CAA requirements into their permitting requirements. Because the MDAQMD refuses to implement CAA requirements regarding offsets, the EPA must implement a FIP that effectuates those requirements.

**IV. Final Action**

In this rulemaking, the EPA is taking final action in response to the court remand of EPA's June 30, 2023 LA/LD action.[128] The EPA is disapproving MDAQMD's Rule 1304(C)(2)(d) because this rule continues to be insufficient to meet requirements for determining the quantity of offsets needed to issue a permit for a major modification.[129] In this rulemaking, the EPA has provided additional explanation to support this disapproval of Rule 1304(C)(2)(d). This includes an analysis of the EPA's prior action in 1996, which shows that the EPA did not fully consider applicable requirements at that time and that there have also since been intervening changes to EPA regulations. These responses supplement the EPA's rationale provided for the 2023 LA/LD action.[130] EPA affirms its disapproval of Rule 1304(C)(2)(d) in the 2023 LA/LD action[131] in this new final action based on the additional reasoning provided in this rulemaking and the record the EPA compiled to support the 2023 LA/LD action.

In addition, in accordance with CAA section 110(c), the EPA is finalizing a FIP for the NNSR program for the MDAQMD portion of the West Mojave Desert ozone nonattainment area and the San Bernardino County and Trona

---

[124] 40 CFR 52.285(c)(2) (incorporating Appendix S, section IV.F.).

[125] 40 CFR 52.285(b)(referencing the definitions in Appendix S including the definition of PTE in 40 CFR 52.285(e)(2)(ii)(C)).

[126] Appendix S section II.A.3.

[127] On November 8, 2024, CBD and the EPA filed a joint stipulation to extend the original November 29, 2024 deadline to January 10, 2025. *Center for Biological Diversity et al.,* v. *Regan,* No. 3:22–cv–03309–RS (N.D. Cal.). This consent decree and the parties' joint stipulation to extend the consent decree deadline is also available in the docket for this action.

[128] 88 FR 42258.

[129] The EPA's disapproval of Rule 1304(C)(2)(d) in this action, as in the 2023 LA/LD, is limited; the provision remains a part of the SIP, as justified under CAA sections 110(k)(3) and 301(a).

[130] Id.

[131] Id.

Planning Area PM$_{10}$ nonattainment areas. The EPA is finalizing the FIP as proposed except for one change to address an oversight error that is in the proposed rule text: in 40 CFR 52.285(b)(1)(i), the definition of "actual emissions," the EPA is inserting the text "*, or for establishing a PAL under paragraph IV.K of 40 CFR part 51, appendix S*" to the first sentence of the definition. The added text clarifies the terms that are to be used in establishing a Plantwide Applicability Limit (PAL), as described in Appendix S, which the FIP incorporates by reference.[132] The EPA is not requesting public comment on the fix to this minor typographical error since it merely applies the text that is in Appendix S.[133]

The FIP applies only to construction of new major stationary sources and major modifications at existing major stationary source in these nonattainment areas. The FIP implements statutory requirements in CAA sections 110(c)(1), 172(c)(5), 173, 179(b), 182(c) and (d), 189(a)(1)(A) and (e), 301(a), and 302.

The FIP will be directly implemented and enforced by the EPA. The FIP authorizes the EPA to delegate implementation of the FIP to the MDAQMD if the District requests such delegation. The FIP will apply until the MDAQMD revises its SIP to address deficiencies identified by the EPA and the EPA fully approves the MDAQMD's NNSR SIP.

As we explained in the proposal for this action, should the MDAQMD submit a SIP revision that corrects some, but not all, of the deficiencies identified in our June 30, 2023 rulemaking, the permit approval criteria for this FIP could be limited to the remaining deficiencies that the EPA identified.[134] As described in the proposal for this action, permit applicants would still need to comply with any portions of the FIP that remain after the EPA approves the MDAQMD's revised rules in the SIP. Likewise, if a court invalidates any one of these elements of the FIP, the EPA intends the remainder of this action to remain effective, as the EPA finds each portion of it to be appropriate even if one or more parts of it have been set aside.

---

[132] See 40 CFR 52.285(d), "Permit approval criteria."

[133] Furthermore, the EPA notes that the PAL provisions in the FIP are not likely to be utilized by any permit applicants because the MDAQMD no longer has a PAL program in its NSR rules.

[134] 88 FR 42264–42266; See also 87 FR 72434, 72438 (November 25, 2022).

## V. Supporting Information

### A. Policy on Children's Health

In 2021, the EPA updated its *Policy on Children's Health* to reflect that "children's environmental health refers to the effect of environmental exposure during early life: from conception, infancy, early childhood and through adolescence until 21 years of age." In addition, the policy applies to "effects of early life exposures [that] may also arise in adulthood or in later generations." In this action, the EPA is finalizing a program that would implement our federal regulations in the nonattainment areas under the MDAQMD. In so far as there is an impact from this action, it will be positive since the deficiencies in the District's program it is meant to rectify would likely result in increased emissions as compared to this FIP and our federal NNSR regulations.

### B. Judicial Review

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by February 28, 2025.

Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this rule for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements (see section 307(b)(2)).

## VI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review

This action is not a significant regulatory action as defined in Executive Order 12866 (58 FR 51735, October 1993), as amended by Executive Order 14094 (88 FR 21879, April 11, 2023), and was, therefore, not subject to a requirement for Executive Order 12866 review.

### B. Paperwork Reduction Act

This action does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*) because this final rule implements existing requirements under the CAA and 40 CFR 51.160–165. The Office of Management and Budget (OMB) has previously approved the information collection activities in the existing PSD and NNSR regulations under OMB control number 2060–0003. The burden associated with obtaining an NNSR permit for a major stationary source undergoing a major modification is already accounted for under the approved information collection requests. Thus, the EPA is not conducting an information collection request for this action.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action is unlikely to impact small entities because the permitting requirements implemented through this action are applicable only to construction or modification of major stationary sources of air pollution. In the MDAQMD, major sources are those that emit, or have the potential to emit 25 tons per year or more of NO$_X$, Sulfur Oxides, or volatile organic compounds (VOCs); or 15 tons per year or more of PM$_{10}$. To the extent that any small entities would own or operate sources capable of emitting this much air pollution, the requirements of this action apply only to construction of new major sources, or major modifications to existing major sources, located in the portions of the MDAQMD that are subject to the requirements of this action. The EPA does not have information to suggest that there currently are a substantial number of major stationary sources located in the MDAQMD that are owned or operated by small entities. The Agency also does not have any information on future modifications that any such existing major sources may engage in after the effective date of this FIP. Further, the Agency does not have information that suggests one or more small entities will seek to construct a new major stationary source in the MDAQMD.

Even if the federal permitting requirements established in this FIP could be applicable to one or more small entities, these requirements would not have significant economic impact on such a small entity. Furthermore, any impact would not affect a substantial number of small entities. This FIP ensures that such small entities and other sources subject to the FIP requirements meet CAA requirements to which these sources should have already been subject. Upon finalization of this action, sources applying for a

permit will be required to submit application materials to the EPA in compliance with the FIP. These sources are already subject to NNSR requirements under the District's SIP, including the requirements to submit applications, to obtain offsets, and to install pollution control technology that satisfies Federal standards. Consequently, the incremental impact associated with application of the specific requirements of the NNSR regulations for certain sources emitting nonattainment criteria pollutants or its precursors is expected to be de minimis, primarily pertaining to the amount of offsets needed.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million or more, as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action imposes no enforceable duty on any state, local or tribal governments or the private sector.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications, as specified in Executive Order 13175, because this proposed rule would not apply on any Indian reservation land or in any other area where the EPA or an Indian tribe has demonstrated that the tribe has jurisdiction, and it will not impose substantial direct costs on tribal governments or preempt tribal law. Thus, Executive Order 13175 does not apply to this action.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

Executive Order 13045 directs federal agencies to include an evaluation of the health and safety effects of the planned regulation on children in Federal health and safety standards and explain why the regulation is preferable to potentially effective and reasonably feasible alternatives. This action is not subject to Executive Order 13045 because it is not a significant regulatory action under section 3(f)(1) of Executive

Order 12866. The EPA does not believe the environmental health or safety risks addressed by this action present a disproportionate risk to children because it implements specific standards established by Congress in statutes.

However, EPA's *Policy on Children's Health* applies to this action. Information on how the Policy was applied is available under "Children's Environmental Health" in the Supporting Information section of this preamble.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211 (66 FR 28355, May 22, 2001), because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All*

The EPA believes that it is not practicable to assess whether the human health or environmental conditions that exist prior to this action result in disproportionate and adverse effects on communities with environmental justice concerns. The EPA performed an EJ analysis, as is described in the proposed action, 89 FR 56237, July 9, 2024, in the section titled, "Environmental Justice Considerations." The analysis was done for the purpose of providing additional context and information about this rulemaking to the public, not as a basis for the action. While the EPA can identify the existing major sources in the nonattainment areas that would be impacted by this action, the EPA cannot quantify the number or types of sources that will undertake major modifications in the future. Additionally, the EPA cannot know whether new major sources will locate in the nonattainment area and what emissions these sources may have. The impacts of the action are likely to vary greatly depending on the source category, number and location of facilities, and the pollutants and potential controls addressed. Therefore, while the EPA cannot quantify the precise baseline conditions and impacts, to the extent that this action will have

impacts, it will not result in disproportionate and adverse effects on communities with EJ concerns as compared with baseline human health and environmental conditions.

In finalizing this action, the EPA will replace the MDAQMD in implementation of the District's NNSR program through the FIP. Therefore, the EPA does not anticipate that this action will result in any negative impacts to human health and the environment negative impacts. If this action has any impact on human health or the environment it will be beneficial in so far as the FIP action will address deficiencies associated with the calculation of emission offsets in the NNSR program. As explained in section II of the preamble of the proposal of this action, this FIP is being promulgated to address several deficiencies with the MDAQMD's NNSR program. See 89 FR 56237, 56239. While the EPA has not analyzed the health impacts nor the emissions impacts from these deficiencies, the deficient provisions are less stringent than the Federal NNSR requirements that the EPA will be applying if this proposed FIP is finalized. Therefore, in so far as the EPA can qualitatively identify impacts to human health and the environment, the EPA expects this action will ensure the protections provided by the CAA and that the EPA's implementing regulations will be fully realized.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Ammonia, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Ozone, Particulate matter, Reporting and recordkeeping requirements, Volatile organic compounds.

**Michael Regan,**
*Administrator.*

For the reasons stated in the preamble, part 52 of title 40 of the Code of Federal Regulations is amended as follows:

**PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS**

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

**Subpart F—California**

■ 2. Section 52.285 is added to read as follows:

**§ 52.285 Review of new sources and modifications—Mojave Desert Air Quality Management District.**

(a) *Plan overview*—(1) *What is the purpose of the Federal Implementation Plan (FIP or ''plan'')?*

(i) The FIP has the following purposes: It establishes the Federal preconstruction permitting requirements for new major sources and major modifications located in nonattainment areas within the Mojave Desert Air Quality Management District (MDAQMD or ''District'') that are major for a nonattainment pollutant.

(ii) The plan serves as the Federal nonattainment new source review (NNSR or ''nonattainment major NSR'') plan for the area described in paragraph (a)(1)(i) of this section, which the EPA has determined does not meet all of the Clean Air Act (CAA or ''Act'') title I part D requirements for NNSR programs. Sources subject to the plan must comply with the provisions and requirements of 40 CFR part 51, appendix S. The FIP also sets forth the criteria and procedures that the reviewing authority (as defined in paragraph (b)(1)(v) of this section) must use to issue permits under the plan. For the purposes of the plan, the term *SIP* means any EPA-approved implementation plan for the area administered by the MDAQMD.

(iii) Paragraph (f)(3) of this section sets forth procedures for appealing a permit decision issued under the plan.

(iv) The plan does not apply in Indian country, as defined in 18 U.S.C. 1151 and 40 CFR 49.167, located within the MDAQMD.

(2) *Where does the plan apply?* (i) The provisions of the plan apply to the proposed construction of any new major stationary source or major modification in the MDAQMD that is major for a nonattainment pollutant, if the stationary source or modification is located anywhere in the designated nonattainment area.

(3) *What general provisions apply under the plan?* The following general provisions apply to you as an owner or operator of a source:

(i) If you propose to construct a new major source or a major modification in a nonattainment area in the MDAQMD, you must obtain a Federal NNSR permit (''permit'') under the plan before beginning actual construction. You may not begin actual construction after the effective date of the plan without applying for and receiving a Federal NNSR permit that authorizes construction pursuant to the plan.

(ii) You must construct and operate your source or modification in accordance with the terms of your permit issued under the plan.

(iii) Issuance of a permit under the plan does not relieve you of the responsibility to fully comply with applicable provisions of any EPA-approved implementation plan or FIP, and any other requirements under applicable law. This includes obligations to comply with any EPA-approved SIP provisions that satisfy Federal new source review (NSR) requirements.

(b) *Definitions.* For the purposes of the plan, the definitions in 40 CFR part 51, appendix S, paragraph II.A, and 40 CFR 51.100 apply, except for paragraphs (b)(1) through (6) of this section, which replace the corresponding definitions found in part 51, appendix S:

(1) *Actual emissions* means the actual rate of emissions of a regulated NSR pollutant from an emissions unit, as determined in accordance with paragraphs (b)(1)(i) and (ii) of this section, except that this paragraph (b)(1) shall not apply for calculating whether a significant emissions increase has occurred, or for establishing a PAL under paragraph IV.K of 40 CFR part 51, appendix S. Instead, 40 CFR part 51, appendix S, paragraphs II.A.24 and 30, shall apply for those purposes.

(i) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a consecutive 24-month period that precedes the particular date and that is representative of normal source operation. The reviewing authority shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(ii) For any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

(2) *Enforceable as a practical matter* means that an emission limitation or other standard is both legally and practically enforceable as follows:

(i) An emission limitation or other standard is legally enforceable if the reviewing authority has the legal power to enforce it.

(ii) Practical enforceability for an emission limitation or for other standards (design standards, equipment standards, work practices, operational standards, pollution prevention techniques) in a permit for a source is achieved if the permit's provisions specify:

(A) A limitation or standard and the emissions units or activities at the source subject to the limitation or standard;

(B) The time period for the limitation or standard (*e.g.*, hourly, daily, monthly and/or annual limits such as rolling annual limits); and

(C) The method to determine compliance, including appropriate monitoring, recordkeeping, reporting, and testing.

(3) *Environmental Appeals Board* means the Board within the EPA described in 40 CFR 1.25(e).

(4) *Nonattainment pollutant* means any regulated NSR pollutant for which the MDAQMD, or portion of the MDAQMD, has been designated as nonattainment, as codified in 40 CFR 81.305, as well as any precursor of such regulated NSR pollutant specified in 40 CFR part 51, appendix S, paragraph II.A.31.(ii)(b).

(5) *Reviewing authority* means the Administrator of EPA Region IX, but it may include the MDAQMD if the Administrator delegates the power to administer the FIP under paragraph (g) of this section.

(6) *Significant* means, in reference to an emissions increase or a net emissions increase, and notwithstanding the definition of ''significant'' in 40 CFR part 51, appendix S, paragraph II.A.10, any increase in actual emissions of volatile organic compounds or oxides of nitrogen that would result from any physical change in, or change in the method of operation of, a major stationary source locating in a serious or severe ozone nonattainment area if such emissions increase of volatile organic compounds or oxides of nitrogen exceeds 25 tons per year when aggregated with all other net emissions increases from the source over any period of 5 consecutive calendar years that includes the calendar year in which such increase occurred.

(c) *Does the plan apply to me?* (1) In any MDAQMD nonattainment area, the requirements of the plan apply to you under the following circumstances:

(i) If you propose to construct a new major stationary source and your source is a major source of nonattainment pollutant(s).

(ii) If you own or operate a major stationary source and propose to construct a major modification, where your source is a major source of nonattainment pollutant(s) and the

proposed modification is a major modification for the nonattainment pollutant.

(2) At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation that was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements of the plan shall apply to the source or modification as though construction had not yet commenced on the source or modification.

(d) *Permit approval criteria*—(1) *What are the general criteria for permit approval?* The criteria for approval of applications for permits submitted pursuant to the plan are provided in part D of title I of the Act and in 40 CFR 51.160 through 51.165 and 40 CFR part 51, appendix S.

(2) *What are the plan-specific criteria for permit approval?* Consistent with the requirements in 40 CFR part 51, appendix S, the reviewing authority shall not approve a permit application unless it meets the following criteria:

(i) The lowest achievable emission rate (LAER) requirement for any NSR pollutant subject to the plan and monitoring, recordkeeping, reporting, and testing as necessary to assure compliance with LAER.

(ii) Certification that all existing major sources owned or operated by the applicant in California are in compliance or, on a schedule for compliance, with all applicable emission limitations and standards under the Act.

(iii) Any source or modification subject to the plan must obtain emission reductions (offsets) from existing sources in the area of the proposed source (whether or not under the same ownership) such that there will be reasonable progress toward attainment of the applicable NAAQS. Notwithstanding 40 CFR part 51, appendix S, paragraph IV.G.5, intercursor offsetting is not permitted between precursors of ozone. A demonstration of reasonable progress toward attainment shall include:

(A) A demonstration that the emission offsets will provide a net air quality benefit in the affected area, as required under 40 CFR part 51, appendix S, paragraph IV.A, Condition 4.

(B) A demonstration that emissions reductions otherwise required by the Act are not credited for purposes of satisfying the offset requirements in this paragraph (d)(2)(iii) and part D of title I of the Act.

(iv) An analysis of alternative sites, sizes, production processes and environmental control techniques for such proposed major source or major modification that demonstrates that the benefits of the proposed major source or major modification significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.

(3) *What are the application requirements?* The owner or operator of any proposed new major stationary source or major modification shall submit a complete application using EPA Region IX's electronic system, which is described in paragraph (d)(3)(ii) of this section. The application must include the information listed in this paragraph (d)(3) as well as the demonstrations to show compliance with paragraphs (d)(2)(i) through (iv) of this section. The reviewing authority's designation that an application is complete for purposes of permit processing does not preclude the reviewing authority from requesting or accepting any additional information.

(i) *Application content requirements.* (A) Identification of the permit applicant, including contact information.

(B) Address and location of the new or modified source.

(C) Identification and description of all emission points, including information regarding all nonattainment pollutants emitted by all emissions units included in the new source or modification.

(D) A process description of all activities, including design capacity, that may generate emissions of nonattainment pollutants, in sufficient detail to establish the basis for the applicability of standards.

(E) A projected schedule for commencing construction and operation for all emissions units included in the new source or modification.

(F) A projected operating schedule for each emissions unit included in the new source or modification.

(G) A determination as to whether the new source or modification will result in any secondary emissions.

(H) The emission rates of all regulated NSR pollutants, including fugitive and secondary emission rates, if applicable. The emission rates must be described in tons per year (tpy). If necessary, shorter-term rates must be described to allow for compliance using the applicable standard reference test method or other methodology specified (*i.e.,* grams/liter, parts per million volume (ppmv) or parts per million weight (ppmw), lbs/MMBtu).

(I) The calculations on which the emission rate information is based, including fuel specifications, if applicable, and any other assumptions used to determine the emission rates (*e.g.,* higher heating value (HHV), sulfur content of natural gas, VOC content).

(J) The calculations, pursuant to 40 CFR part 51, appendix S, paragraph IV.I and IV.J, that are used to determine applicability of the plan, including the emission calculations (increases or decreases) for each project that occurred during the contemporaneous period, as applicable.

(K) The calculations, pursuant to 40 CFR part 51, appendix S, paragraph IV.A, used to determine the quantity of offsets required for the new source or modification.

(L) Identification of actual emission reductions that meet the offset integrity criteria of being real, surplus, quantifiable, permanent and federally enforceable.

(M) If applicable, a description of how performance testing will be conducted, including test methods and a general description of testing protocols.

(N) Information necessary to determine whether issuance of such permit:

(*1*) May adversely affect federally-listed threatened or endangered species or the designated critical habitat of such species; or

(*2*) Has the potential to cause adverse effects on historic properties.

(ii) *Application process requirements.* To submit an application required under the plan, applicants may submit electronically through the Central Data Exchange (CDX)/Compliance and Emissions Data Reporting Interface (CEDRI) or submit by mail.

(A) CDX/CEDRI is accessed through *https://cdx.epa.gov.* First-time users will need to register with CDX. The CDX platform will also be used for any permit reporting requirements.

(B) Applicants that do not apply using CDX/CEDRI shall mail a signed application using certified mail (do not request signature) to: Air and Radiation Division, Permits Office (Air-3-1), U.S. EPA, Region 9, 75 Hawthorne Street, San Francisco, CA 94105.

(C) Applicants that apply using certified mail must email a copy of the application and the certified mail tracking number to provide notification of delivery receipt to *R9AirPermits@epa.gov.*

(4) *What are the requirements for monitoring, recordkeeping, and reporting?* The reviewing authority shall require in the conditions of a permit such monitoring, recordkeeping, and reporting as necessary to facilitate

compliance with the terms of a permit and to make them enforceable as a practical matter.

(e) *Public participation requirements*—(1) *What permit information will be publicly available?* With the exception of any confidential information as defined in 40 CFR part 2, subpart B, the reviewing authority must make available for public inspection the documents listed in paragraphs (e)(1)(i) through (iv) of this section. The reviewing authority must make such information available for public inspection at the appropriate EPA Regional Office and in at least one location in the area affected by the source, such as the MDAQMD headquarters location or a local library.

(i) All information submitted as part of your permit application as required under paragraph (d)(3) of this section.

(ii) Any additional information requested by the reviewing authority.

(iii) The reviewing authority's analysis of the application and any additional information submitted by you, including the LAER analysis and, where applicable, the analysis of your emissions reductions (offsets), your demonstration of a net air quality benefit in the affected area and your analysis of alternative sites, sizes, production processes and environmental control techniques.

(iv) A copy of the draft permit or the draft decision to deny the permit with the justification for denial.

(2) *How will the public be notified and participate?* (i) Before issuing a permit under the plan, the reviewing authority must prepare a draft permit and provide adequate public notice to ensure that the affected community and the general public have reasonable access to the application and draft permit information, as set out in this paragraph (e)(2)(i) and paragraph (e)(2)(ii) of this section. The public notice must provide an opportunity for public comment and notice of a public hearing, if any, on the draft permit.

(A) The reviewing authority must mail a copy of the notice to you (the permit applicant), the MDAQMD (or the EPA if there is a delegation under paragraph (g) of this section), and the California Air Resources Board (CARB).

(B) The reviewing authority must comply with the methods listed in paragraph (e)(2)(i)(B)(*1*) or (*2*) of this section:

(*1*) The reviewing authority must post the notice on its website.

(*2*) The reviewing authority must publish the notice in a newspaper of general circulation in the area affected by the source.

(*3*) The reviewing authority may also include other forms of notice as appropriate. This may include posting copies of the notice at one or more locations in the area affected by the source, such as at post offices, libraries, community centers or other gathering places in the community.

(ii) The notices required pursuant to paragraph (c)(2)(i) of this section must include the following information at a minimum:

(A) Identifying information, including the name and address of the permit applicant (and the plant name and address if different);

(B) The name and address of the reviewing authority processing the permit application;

(C) The regulated NSR pollutants to be emitted, and identification of the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project, including any emission limitations for these emissions unit(s);

(D) The emissions change involved in the permit action;

(E) Instructions for requesting a public hearing;

(F) The name, address and telephone number of a contact person in the reviewing authority's office from whom additional information may be obtained;

(G) Locations and times of availability of the information, listed in paragraph (e)(1) of this section, for public inspection; and

(H) A statement that any person may submit written comments, a written request for a public hearing or both, on the draft permit action. The reviewing authority must provide a period of at least 30 days from the date of the public notice for comments and for requests for a public hearing.

(3) *How will the public comment and will there be a public hearing?* (i) Any person may submit written comments on the draft permit and may request a public hearing. The comments must raise any reasonably ascertainable issue with supporting arguments by the close of the public comment period (including any public hearing). The reviewing authority must consider all comments in making the final decision. The reviewing authority must keep a record of the commenters and of the issues raised during the public participation process, and such records must be available to the public.

(ii) The reviewing authority must extend the public comment period under paragraph (e)(2) of this section to the close of any public hearing under this section. The hearing officer may also extend the comment period by so stating at the hearing.

(iii) A request for a public hearing must be in writing and must state the nature of the issues proposed to be raised at the hearing.

(iv) If requested, the reviewing authority may hold a public hearing at its discretion to give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written statements. The reviewing authority may also hold a public hearing at its discretion, whenever, for instance, such a hearing might clarify one or more issues involved in the permit decision. The reviewing authority must provide notice of any public hearing at least 30 days prior to the date of the hearing. Public notice of the hearing may be concurrent with that of the draft permit, and the two notices may be combined. Reasonable limits may be set upon the time allowed for oral statements at the hearing.

(v) The reviewing authority must make the written transcript of any hearing available to the public.

(f) *Final permit issuance and administrative and judicial review*—(1) *How will final action occur and when will my Federal NNSR permit become effective?* After making a decision on a permit application, the reviewing authority must notify you, the permit applicant, of the decision in writing, and, if the permit is denied, provide the reasons for such denial and the procedures for appeal. If the reviewing authority issues a final permit to you, it must make a copy of the permit available at any location where the draft permit was made available. In addition, the reviewing authority must provide adequate public notice of the final permit decision to ensure that the affected community, the general public and any individuals who commented on the draft permit have reasonable access to the decision and supporting materials. A final permit becomes effective 30 days after service of the final permit decision, unless:

(i) A later effective date is specified in the permit;

(ii) Review of the final permit is requested under paragraph (f)(3) of this section; or

(iii) No comments requested a change in the draft permit or a denial of the permit, in which case the reviewing authority may make the permit effective immediately upon issuance.

(2) *What is the administrative record for each final permit?* (i) The reviewing authority must base final permit decisions on an administrative record consisting of:

(A) All comments received during any public comment period, including any extension or reopening;

(B) The tape or transcript of any hearing(s) held;

(C) Any written material submitted at such a hearing;

(D) Any new materials placed in the record as a result of the reviewing authority's evaluation of public comments;

(E) Other documents in the supporting files for the permit that were relied upon in the decision-making;

(F) The final Federal NNSR permit;

(G) The application and any supporting data furnished by you, the permit applicant;

(H) The draft permit or notice of intent to deny the application or to terminate the permit; and

(I) Other documents in the supporting files for the draft permit that were relied upon in the decision-making.

(ii) The additional documents required under paragraph (f)(2)(i) of this section should be added to the record as soon as possible after their receipt or publication by the reviewing authority. The record must be complete on the date the final permit is issued.

(iii) Material readily available or published materials that are generally available and that are included in the administrative record under the standards of paragraph (f)(2)(i) of this section need not be physically included in the same file as the rest of the record as long as it is specifically referred to in that file.

(3) *Can permit decisions be appealed?* (i) Permit decisions may be appealed under the permit appeal procedures of 40 CFR 124.19, and the provisions of that section applicable to prevention of significant deterioration (PSD) permits shall apply to permit decisions under the FIP. A petition for review must be filed with the Clerk of the Environmental Appeals Board within 30 days after the reviewing authority serves notice of the issuance of a final permit decision under the plan, in accordance with 40 CFR 124.19.

(ii) An appeal under paragraph (f)(3)(i) of this section is, under section 307(b) of the Act, a prerequisite to seeking judicial review of the final agency action.

(4) *Can my permit be reopened?* The reviewing authority may reopen an existing, currently-in-effect permit for cause on its own initiative, such as if it contains a material mistake or fails to assure compliance with requirements in this section. However, except for those permit reopenings that do not increase the emission limitations in the permit, such as permit reopenings that correct

typographical, calculation and other errors, all other permit reopenings shall be carried out after the opportunity for public notice and comment and in accordance with one or more of the public participation requirements under paragraph (e)(2) of this section.

(5) *Can my permit be rescinded?* (i) Any permit issued under this section, or a prior version of this section, shall remain in effect until it is rescinded under this paragraph (f)(5).

(ii) An owner or operator of a stationary source or modification who holds a permit issued under this section for the construction of a new source or modification that meets the requirement in paragraph (f)(5)(iii) of this section may request that the reviewing authority rescind the permit or a particular portion of the permit.

(iii) The reviewing authority may grant an application for rescission if the application shows that the provisions of the plan would not apply to the source or modification.

(iv) If the reviewing authority rescinds a permit under this paragraph (f), the public shall be given adequate notice of the rescission determination in accordance with paragraph (e)(2)(i)(B) of this section.

(g) *Administration and delegation of the Federal nonattainment major NSR plan in the MDAQMD*—(1) *Who administers the FIP in the MDAQMD?* (i) The Administrator is the reviewing authority and will directly administer all aspects of the FIP in the MDAQMD under Federal authority.

(ii) The Administrator may delegate Federal authority to administer specific portions of the FIP to the MDAQMD upon request, in accordance with the provisions of paragraph (g)(2) of this section. If the MDAQMD has been granted such delegation, it will be the reviewing authority for purposes of the provisions for which it has been granted delegation.

(2) *Delegation of administration of the FIP to the MDAQMD.* This paragraph (g)(2) establishes the process by which the Administrator may delegate authority to the MDAQMD in accordance with the provisions in paragraphs (g)(2)(i) through (iv) of this section. Any Federal requirements under the plan that are administered by the delegate MDAQMD are enforceable by the EPA under Federal law.

(i) *Information to be included in the Administrative Delegation Request.* To be delegated authority to administer the FIP or specific portions of it, the MDAQMD must submit a request to the Administrator.

(ii) *Delegation Agreement.* A Delegation Agreement will set forth the

terms and conditions of the delegation, will specify the provisions that the delegate MDAQMD will be authorized to implement on behalf of the EPA and will be entered into by the Administrator and the MDAQMD. The Agreement will become effective upon the date that both the Administrator and the MDAQMD have signed the Agreement or as otherwise stated in the Agreement. Once the delegation becomes effective, the MDAQMD will be responsible, to the extent specified in the Agreement, for administration of the provisions of the FIP that are subject to the Agreement.

(iii) *Publication of notice of the Agreement.* The Administrator will publish a notice in the **Federal Register** informing the public of any Delegation Agreement. The Administrator also will publish the notice in a newspaper of general circulation in the MDAQMD. In addition, the Administrator will mail a copy of the notice to persons on a mailing list developed by the Administrator consisting of those persons who have requested to be placed on such a mailing list.

(iv) *Revision or revocation of an Agreement.* A Delegation Agreement may be modified, amended or revoked, in part or in whole, by the Administrator after consultation with the MDAQMD.

[FR Doc. 2024–30513 Filed 12–27–24; 8:45 am]

**BILLING CODE 6560–50–P**

---

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Parts 52 and 81

[EPA–R05–OAR–2023–0498; FRL–12265–02–R5]

### Air Plan Approval; Illinois; Alton Township 2010 Sulfur Dioxide Redesignation and Maintenance Plan

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

---

**SUMMARY:** The Environmental Protection Agency (EPA) is approving Illinois' request to redesignate the Alton Township nonattainment area in Madison County, Illinois to attainment for the 2010 sulfur dioxide ($SO_2$) National Ambient Air Quality Standard (NAAQS). EPA is also approving Illinois' maintenance plan for the area. Illinois submitted the request for approval on October 2, 2023. Additionally, EPA is taking final action to determine that the Alton Township area attained the 2010 $SO_2$ NAAQS by the September 12, 2021, attainment